Michael K. Hepworth (UT-15157)
Christoffer T. Binning (UT-17942)
**HEPWORTH LEGAL**
320 W 500 S, Ste. 200
Bountiful, Utah 84010
Phone: (801) 872-2222
michael@hepworthlegal.com
cbinning@hepworthlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **NARVIN LICHFIELD**, an individual, | |
| *Plaintiff,* | **COMPLAINT** |
| *vs.* | **Case No.:** |
| **KATHERINE KUBLER**, an individual; **NETFLIX, INC.**, a Delaware Corporation; and **JOHN DOES A-L**, | **Judge:** |
| *Defendants.* | *(Jury Demand)* |

Plaintiff Narvin Lichfield, in support of his Complaint against Defendants Katherine Kubler, Netflix, Inc., and John Does A-L, hereby states the following:

## INTRODUCTION

This is an action for defamation and false light invasion of privacy arising from knowingly false statements and attributions concerning plaintiff Narvin Lichfield ("Narvin") made by defendants Katherine Kubler ("Kubler") and Netflix, Inc. ("Netflix") in their series entitled: The Program: Cons, Cults, and Kidnapping ("The Series").

This complaint seeks to hold Defendants accountable for their egregious conduct and to restore Plaintiff's reputation and peace of mind. The facts in this complaint will demonstrate the extent of Defendants' malicious campaign and its devastating impact on Plaintiff's life and livelihood. The

false accusations made and disseminated by Defendants have immensely harmed Plaintiff financially, mentally, and reputationally. Through this action, Plaintiff seeks not only to vindicate his rights but to send a clear message that such vicious and baseless attacks will not be tolerated in a just society.

## PARTIES, JURISDICTION, AND VENUE

1.      At all material times, Narvin is and was a citizen and resident of the state of Utah.

2.      Defendant Netflix is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business in California. It is a media giant whose programming is available worldwide, with 238.3 million paid subscribers and total revenues of $33.7 billion in 2023.[1]

3.      Defendant Kubler is, and at all relevant times was, an individual residing in Pasadena, California.

4.      The Court has diverse citizenship subject matter jurisdiction under 28 U.S.C. § 1332. The parties are completely diverse, and the amount in controversy exceeds $75,000.

5.      This Court has personal jurisdiction over Defendant Netflix because Netflix conducts substantial business in the State of Utah and has sufficient minimum contacts with Utah such that the exercise of jurisdiction by this Court does not offend traditional notions of fair play and substantial justice.

6.      This Court has personal jurisdiction over Defendant Katherine Kubler because she created and played a substantial role in the creation of The Series, which has been widely disseminated by and through Netflix, including in Utah, such that the exercise of jurisdiction by this Court does not offend traditional notions of fair play and substantial justice.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, and under 28 U.S.C. §

---

[1] https://www.businessofapps.com/data/netflix-statistics/

1391(b)(3) because Defendants are subject to the Court's jurisdiction concerning this action.

## <u>GENERAL ALLEGATIONS</u>

8. Narvin is an individual who was involved in operating programs for troubled youth for over 32 years.

9. Defendants Netflix, Katherine Kubler, and several as-yet unidentified parties created and released a three-episode production series titled "The Program" (the "Production") that presented itself as a documentary and focused on specific youth programs, including some that Narvin was involved with.

10. The Production, executively produced by Netflix, presented statements by several individuals, including Defendant Kubler, and therefore, such statements should be construed as Netflix directly making those statements itself, such as when the Production stated it was surreal to see Narvin in person "[k]nowing everything [Kubler] knew about [Plaintiff], the children he abused, the parents he conned, all the crimes he's gotten away with [. . . .]" and stating he had "gotten away with this for so long [. . . .]" [2]

11. The Production made representations tending to state to the average, reasonable viewer that Narvin had either directly facilitated and covered up or outright committed murder, suggesting as much through explicit statements and selective editing to portray Narvin's photograph prominently next to a newspaper clipping of an article purporting to report on a murder at a youth program facility like those the Production claims Narvin used to commit child abuse. [3] *See screenshot, below.*

---

[2] *See* Production, Part 3, timestamp for time remaining at 18:02–17:52.
[3] *See* Production, Part 3, timestamp for time remaining at 1:05:44–1:05:41.



12. The Production also selectively withheld the relevant abuse and suicide claim statistics of the number of children attending programs such as the Academy at Ivy Ridge (which it prominently highlighted) and other similar youth programs, failing to mention that more than 40,000 children attended such programs with less than the average rate of suicides for Americans being observed among this set of children and with a negligible percentage of these children ever claiming abuse occurred.

13. The Production framed and outright stated Narvin was held supervisory and executive control over the staffing and day-to-day operation over Ivy Ridge when this was a lie.

14. The Production falsely stated that youth programs Narvin and his family were associated with were raided by police and shut down for abusing the children enrolled in these programs when, in fact, these programs were voluntarily closed out of concern for student safety and were not shut down by authorities for abuse.[4]

15. Such statements by Defendants were calculated, in the larger context of the other statements

---

[4] *See, e.g.,* Production, Part 1, timestamp for time remaining at 9:35.

made in the Production and in the tone and structure of the Production itself, to further convince viewers of the Production that Narvin committed and facilitated child abuse.

16. The Production included false statements from purported experts claiming Narvin was a "punchline" and "wildcard," further defaming his character without basis.[5]

17. The Production is billed in its opening title card and credits as a "Netflix original," with the Production, upon information and belief, appearing on no other major video streaming platform.

18. The subtitle of the Production included the phrase "Cons, Cults and Kidnapping," which falsely implied that the youth programs Narvin was associated with constituted criminal fraud, were cult-like, and kidnapped children, when in fact, they were legal programs that parents consented to place their minor children in without ever engaging in actions that could reasonably be referred to as "kidnapping." *See screenshot, below.*



19. The Production makes several claims of specific criminal activities that the youth programs

---

[5] *See, e.g.,* Production, Part 3, timestamp for time remaining at 41:34–41:25 (calling Narvin as "punchline" and then, at 41:27, beginning the statement by an interviewee for Defendants that he is a "wildcard").

Narvin was associated with committed or facilitated, with Defendants claiming "kidnapping" was one such activity, thus summoning a legal meaning of kidnapping to the viewership Defendants published the Production to.[6]

20. The Production presented itself as an objective documentary, despite not showing a balanced and unbiased presentation of the facts surrounding the youth programs; it showcased and presented Defendant Kubler's animus against Plaintiff as a reasonable and well-educated journalistic take while taking extreme measures to present Plaintiff in a false light with half-truths, outright lies, and deceptive editing practices.

21. For instance, the Production claimed to apply standards of journalistic ethics and integrity by refusing to disclose the identity of a past Ivy Ridge employee when presenting the details of allegations of sexual abuse by this employee because no formal legal allegations and convictions were made regarding the establishment of these claims. Yet, it disclosed and heavily focused on Narvin's identity when no such convictions were made for Narvin.

22. To this end of presenting itself as an objective documentary, the Production focused on the most troubled and disenchanted former students of Ivy Ridge and then presented these students' attitudes and exaggerated experiences as a universal experience for all past students who have attended programs Narvin was involved with, when none of the students depicted had ever attended a program Narvin supervised, chose staffing for, or directed.

23. The Production opened with a disclaimer stating it included "images and descriptions of abuse involving minors," presenting it as fact that abuse occurred in the programs without using qualifiers like "alleged" while specifically identifying Narvin by name and likeness, thus

---

[6] *See, e.g.,* Production, Part 3, timestamp for time remaining at 31:25–31:18 (Defendant Kubler referring to a transport company agent or employee who was allegedly used by youth groups Narvin was associated with as paid to kidnap minors for transportation to the program and framing an unfortunate and clearly attempted humorous post by this agent or employee about "[kidnapping] in a little [luxury]" as an admission of criminal kidnapping).

falsely painting Narvin as involved in abusing minors along with several other criminal activities. *See screenshot, below.*



24. Specifically, the Production showed Narvin's image in a photograph placed immediately next to a newspaper article about a death in a youth wilderness program, with which Narvin never had any involvement or association, while Kubler's voice is heard in a voiceover stating that people in the "higher ups seem to get away with murder," falsely implying Narvin was responsible for a murder.[7]

25. Narvin has never been charged or formally accused of murder, nor has he had a reputation for being a murderer before the release of the Production.

26. The Production presented allegations of "abuse" that conflate loose definitions of abuse with actual claims of legal abuse, characterizing the military academy-style discipline of grossly troubled and criminally convicted teenagers (such as by turning ninety degrees at corners) as abuse while then accusing youth programs it claims Narvin was involved with of legitimate

---

[7] *See* Production, Part 3, timestamp for time remaining at 1:05:42.

abuse, such as assault.

27. At no time has Narvin ever been involved in the staffing, supervision, or directing of a youth program that was formally and judicially found to involve child abuse as defined by any legal standard while he acted in such a role.

28. In the Production, Defendant Kubler also states on camera that Narvin is "a great name for a villain" and "a weak link [of Narvin's family]," such statements serving to bolster further the claim that he has committed several criminal acts the Production suggests or outright states he has committed while simultaneously assassinating his character in his local community and the nation at large.[8]

29. The Production also showed a social media profile of Narvin going by a name that matches his birth name but with his first name alternatively spelled and with his face visible on the profile, characterizing the presence of this profile as an attempt to hide his identity with the voiceover line: "Narvin Lichfield is a great name for a villain, but he's gone by many aliases. But for a guy who's trying to hide his identity, he is very public on social media."[9]

30. In the Production, Defendant Kubler is also filmed trespassing at a former youth program campus, going through files not belonging to her that were stored inside buildings on this campus.[10]

31.  In the Production, Defendants made more baseless and defamatory statements that the youth program Narvin was involved in abused children, committed crimes, and should be in jail, with this footage designed to suggest that these files provide evidentiary support to these

---

[8] *See* Production, Part 3, timestamp for time remaining at 42:11–42:06; 42:01–41:58 (last time stamp regarding the "villain" comment).
[9] *See* Production, Part 3, timestamp for time remaining at 41:56–41:50 (roughly).
[10] *See, e.g.,* Production, Part 1, timestamp for time remaining at 1:01:52–1:01:10 (roughly) (these kinds of shots of showing youth program documents and property documenting progress of minors for profit through widespread media publication is a recurring motif of all three episodes of the Production, with efforts to protect third-party minors through blurring and other redaction methodologies varying wildly in efficacy).

baseless claims when in fact the files shown make no such suggestion.[11]

32. Plaintiff has never been convicted of child abuse, with Defendants demonstrating due diligence on this fact and stating or suggesting that Plaintiff has committed and been convicted of child abuse nonetheless through editing video clips of Plaintiff being arrested for a criminal case that was ultimately dropped while repeating claims Plaintiff has committed child abuse and had youth programs he was involved in forcible shut down for child abuse by various law enforcement agencies throughout the country and world.

33. In repeating these false statements in a way that suggests they are credible, Defendants used the Production to tie Narvin to youth outreach programs in which Narvin had no degree of involvement or where he had no expected or actual executive control over the staffing and day-to-day operation of those programs.

34. Defendants also filmed and published these confidential files that they accessed through criminal trespass and conversion of these files, disclosing information on and produced by minors for a national audience to frame Narvin, by his association with the youth programs, as an abuser and criminal.[12]

35. The Production invaded Narvin's privacy by secretly filming him at a private karaoke event with friends without permission and included this in the series to further harass and defame him by portraying him in a false light by framing his innocent day-to-day conduct in the overall strategically defamatory media product that is the Production.[13]

36. Defendants also repeated unfounded allegations of torture committed by Narvin and the

---

[11] *Id*. (for proof that no files shown in the Production provide proof of abuse and other allegations of wrongdoing by the youth programs and Narvin, such as murder).

[12] *Id*. (for proof that no files shown in the Production provide proof of abuse and other allegations of wrongdoing by the youth programs and Narvin, such as murder).

[13]*See* Production, Part 3, timestamps time remaining 33:00–32:58 (presented with the representation that Narvin wanted to "live lavishly" and "spend lavishly," framing this vacation as an extravagant venture that financially harmed Narvin's ability to properly fund the youth programs).

youth groups he was a part of.[14]

37. Upon information and belief, Defendants further portrayed Narvin and his participation in the youth programs in a false light by showing vandalism and graffiti at a former program location in the Production's segments, falsely alleging abuse, which Defendant Kubler and her associates staged themselves to fit their false narrative, framing these as if uninterested third parties caused this vandalism and graffiti to further engineer the perception that Defendants' false claims about the youth program and Narvin were widely held and believed before the Production.[15]

38. Upon information and belief, the Production further uses suggestive graffiti staged by production to falsely craft an inflated perception that the youth programs and Narvin have committed widespread child abuse, such as graffiti placed in shots of undiscernible locations suggested to be at youth program locations, such as an opening shot for the first episode of the Production with a grim reaper figure depicted next to words that state "Soul thieves of the youth."[16]

39. Such a statement also implies that Narvin and the youth programs have been directly involved in murdering minors.[17]

40. The Production also shows a scene where a featured guest and "expert" comments that the youth programs were structured as a family business. Defendant Kubler then states that Narvin's family is "definitely" a family of secrets.[18]

41. Such statements, in the context of the other direct allegations and strategically placed

---

[14] *See* Docuemtnary, Part 3, timestamps time remaining 32:41–32:33.
[15] *See, e.g.,* Production, Part 1, timestamps time remaining 17:12 (graffiti stating "I didn't lie,"); 26:25 (graffiti stating "You tried to break us but we on top"); 20:49 (single graffiti tag stating "Rapist"); (graffiti stating "What must I do to be saved?" with style closely matching all other instances mentioned herein and with several other examples found in each of the three parts of the Production).
[16] *See* Production, Part 1, timestamp for time remaining at 1:02:01.
[17] *Id.*
[18] *See* Production, Part 3, timestamp for time remaining at 40:10–39:57.

suggestions made throughout the Production, were used by Defendants to impress upon the average, reasonable viewer that the family-oriented structure of the youth programs business was to cover up previously raised allegations made in the Production, such as murder, systemic child abuse, and criminal kidnapping.

42. The Production also made false claims about program operations, such as stating that students never went outside or made phone calls, a general rule implemented as a policy of the youth programs.[19]

43. The Production made further false claims by stating or strongly suggesting that males strip-searched females, which were untrue and further defamed Narvin through the Production's direct association with alleged illegal and wrongful activities committed by youth programs and thus Narvin by extension.[20]

44. The Production included manipulated and scripted statements from Narvin's estranged son, Nathan, to take advantage of Nathan and portray Narvin in a false light.[21]

45. Specifically, Defendants manipulated Nathan, who has mental health issues, into divulging family matters to Defendants so they may leverage these matters to further knowingly defame Narvin by presenting this information without proper context to lead viewers to believe that Narvin started WWASP to harm people when Narvin never had any ownership in WWASP nor started WWASP.[22]

46. Narvin's association with WWASP was essentially that of a franchisee. Narvin's programs had to pay dues to WWASP for membership, and WWASP's profits were not shared with Narvin.

---

[19] *See, e.g.,* Production, Part 1, timestamp for time remaining at 49:07–48:55; 47:16–47:02.
[20] *See, e.g.,* Production, Part 1, timestamp for time remaining at 51:39–51:36.
[21] *See* Production, Part 3, timestamp for time remaining at 39:01–30:50 (roughly).
[22] *Id.*; see also 38:16–38:04 (with Nathan describing Narvin as "a man with two faces" and a "dark side," which Defendants represented in a larger context of allegations of Narvin and the youth programs he was involved in being instruments for criminal kidnapping, murder, and child abuse.

47. The Production also included statements from Narvin's son where he claimed Narvin used profits from WWASP and affiliated programs to pay for an expensive home in St. George, Utah, along with other expensive assets, where Defendants made no due diligence to uncover the fact that these assets were purchased through earnings in stock market investments and that Narvin had no ownership in WWASP at any time.[23]

48. The Production also shows Defendants Kubler and others burning program files and destroying evidence that could disprove their false allegations to solidify further the mass reception of defamatory statements regarding Narvin, all done through criminal trespassing and stealing private property.[24]

49. Defendants Kubler and others, by improperly removing, destroying, and burning confidential student files that are the private property of the programs, committed theft and conversion of evidence that could, again, potentially disprove their false abuse allegations.[25]

50. The Production makes all of the above mischaracterizations intentionally to craft deceptive presentations to lead the general public into believing false representations regarding Narvin so that he is portrayed in a false and biased light that directly states and implies he has committed child abuse, criminal acts related to such abuse, and murder.

51. Defendants lack any legitimate factual foundation for these false and defamatory representations. Instead, they intentionally manipulate the content of the Production to fit a pre-conceived false narrative, knowing such information is baseless or likely false, causing irreparable harm to Narvin's reputation.

52. The Production included false and defamatory statements from commentators Maia Szalavitz and Tom Houlihan, who were presented as experts despite having no direct experience

---

[23] *See* Production, Part 3, timestamp for time remaining at 36:53–36–40.
[24] *See* Production, Part 3, timestamp for time remaining at 6:25–4:52.
[25] *Id*.

working in the youth programs. These commentators made unsupported claims that the programs were improperly staffed and unprofitable without considering whether such statements were, in fact, true.

53. The Production falsely claimed that students never went outside or participated in activities, directly contradicting other statements made elsewhere in the series. As a result, it defamed the Plaintiff through association with these untrue statements.

54. Defendant Kubler made false claims that the programs lacked sufficient staff and were inexpensive to run when, in fact, they were adequately staffed and faced high operating costs and risks. This demonstrated her lack of understanding of program operations and further defamed the Plaintiff and the programs with misinformation.

55. The Production showed Defendant Kubler and associates trespassing at a former program location, discovering graffiti and staged vandalism they had placed there themselves to falsely paint the program negatively as part of their defamatory and misleading narrative.

56. The Production falsely suggested that many students died by suicide because of the programs when official records show the number of suicides was no higher than national background rates. Defendants inflated these suggestions by making unsubstantiated claims about a large number of deaths that are not factually supported to exist as represented.[26]

57. Defendants inflated and lied about the number of suicides from past students of these youth programs by focusing on the issue of suicide and presenting it as a core problem systemic to these youth programs and by making unsubstantiated claims about disproportionately high

---

[26] *See* Production, Part 3, timestamp for time remaining at 8:05–7:46 (roughly); 7:46–7:14 (claiming "about 40" past participates of youth programs associated with Narvin have killed themselves in a larger segment promoting the allegation that these programs cause high rates of suicide).

deaths that are not factually supported to exist as represented.[27]

58. Over the life of Narvin's 25-plus-year career involved in these youth programs, he has helped over 36,000 students, with a remarkedly low percentage of these students having claimed any abuse (as it may defined by criminal statute or related civil cause of actions in Utah law) or suicide attempts compared to the larger U.S. population of similar demographics to those students.

59. Also, Defendant Kubler is shown picking up a random sticky note with a student's name during her illegal trespass and suggesting the student died in the program, with no evidence whatsoever to support her implication, demonstrating her reckless disregard for the truth in attempting to paint the program in a false light.

60. The Production glorified a student riot started by an individual with a criminal history that put other students and staff at risk of harm, completely misrepresenting the incident to support their defamatory "abuse" narrative when the rioting students perpetrated the actual abuse.[28]

61. The Production deceptively edited and presented an incident of a staff member restraining an attacking student to falsely claim it was an example of staff abusing students, using footage that was taken out of context to do so.

62. The Production made numerous other false claims about the youth programs, such as students never being allowed to make phone calls, go outside, or have more than one "fun day" per year, and males strip-searching females, which were untrue and further defamed the youth programs and Narvin by association.

63. Defendants Kubler and the Production conflated Kubler's personal family issues and poor

---

[27] *See* Production, Part 3, timestamp for time remaining at 8:05–7:46 (roughly); 7:46–7:14 (claiming "about 40" past participates of youth programs associated with Narvin have killed themselves in a larger segment promoting the allegation that these programs cause high rates of suicide).
[28] *See* Production, Part 1, timestamp for time remaining at 7:46–3:18.

academic performance before attending the program with alleged "abuse" at the program to manipulate viewers into believing a false narrative and further defame the parties she targeted.[29]

64. The Production highlighted a 2003 newspaper article about Narvin's false arrest in Costa Rica on abuse charges without disclosing that he was exonerated, and all charges dismissed at the prosecutor's request to obfuscate the truth and lend false credibility to the abuse allegations and further defame Narvin and the programs.[30]

65. Defendants, chiefly among them (upon information and belief) Netflix, selectively omitted contextual and factual information regarding the segment on Narvin's Costa Rica arrest to mislead the average, reasonable viewer into believing Narvin was convicted of child abuse when publicly accessible articles proved Narvin was exonerated of any criminal charges related to that arrest in Costa Rica.

66. The Production intentionally ignored the fact that Narvin's Costa Rican arrest was on charges that were voluntarily dropped by the public prosecutor—a nearly unprecedented outcome given the severity of the underlying allegations advanced by the government—and thus proved those charges leading to the arrest were unsubstantiated, with the Production being carefully crafted in this manner to suggest the opposite of the truth of the criminal matter in Cost Rica.

67. The Production also used manipulative filmmaking techniques like eerie music and ominous imagery while showing Defendant Kubler trespassing and discovering the staged graffiti to create a false impression that the program was hiding terrible secrets and mislead viewers into believing the defamatory allegations.[31]

68. Defendant Kubler's statements in the Production reveal her motivation to pursue and head

---

[29] *See* Production, Part 1, timestamp for time remaining at 56:14–55:44 (roughly).
[30] *See* Production, Part 3, timestamp for time remaining at 35:33–35:11.
[31] *See generally* Production, Parts 1–3.

the creation of the Production—an intention to seek to harm Narvin and others associated with her program experience for profit without regard for the truthfulness of her representations.

69. Defendant Netflix, upon information and belief, exercised a substantial degree of direct control over editing the final product of the Production and had executive decision-making on the content and statements appearing in the Production.

70. Upon information and belief, Defendant Netflix was pivotal in the formation and defamatory nature of the Production by, among other things, having final discretion on its content, such that all statements presented in the Production, including those by Defendant Kubler, were statements formed and articulated by Netflix itself.

71. Upon information and belief, Defendant Netflix conspired with all other Defendants, specifically Defendant Kubler, to realize the Production and advertise it to a large audience that included and targeted Narvin's local community, family members, and business associates.

72. Defendant Netflix also provided critical funding and financial support for all other Defendants, specifically Defendant Kubler, in the production and facilitation of the Production, so that without this funding and support, the Production would not have been realized.

73. Defendant Netflix is responsible for the tone, editing decisions, content, character, funding support, and statements in the Production through its exercise of executive control over and funding of the Production. Therefore, Defendant Netflix is directly involved in the creative process of the Production.

74. Defendant Netflix also took deliberate measures in marketing and advertising to expose the Production to an extensive group of global viewers, with *Forbes* stating in an article that the

limited series "racked up 22.7 million viewing hours between its March 5 premiere and March 10 [according to Netflix's own data analytics]."[32]

75. Such exposure to the Production has tainted Narvin's standing in his local community and his reputation in the eyes of viewers worldwide.

76. Since the premiere of the Production, Narvin has suffered anonymous online threats of violence, targeted group harassment campaigns, online and in-person hate, and been the victim of specific death threats across varying degrees of credibility and concern.

77. Overall, the Production was a dramatized, misleading, and defamatory portrayal of the youth programs and individuals involved. It included dozens of distinct false statements packaged in deceptive editing and outright misrepresentations to push a predetermined false narrative of "abuse" without factual basis, resulting in significant reputational harm to Narvin and others.

## FIRST CAUSE OF ACTION
*Defamation Per Se – Against All Defendants*

78. Plaintiff realleges and incorporates the allegations in each preceding paragraph of this Complaint as if fully set forth herein.

79. Defendants published statements that falsely impute criminal conduct to Plaintiff and tend to injure Plaintiff in his profession. Under Utah law, it is defamation per se to falsely charge someone with a crime or conduct incompatible with the exercise of a lawful business, trade, profession, or office.

80. Defendants' defamatory statements include, but are not limited to, the following:

a. Claiming or taking action to distribute a media product where Defendant Kubler claims Plaintiff had "gotten away with this for so long [. . .]" seconds after saying it was

---

[32] *See* Forbes>Business>Breaking, "'The Program' Docuseries Is Among Netflix's Most-Watched: What To Know About The Real Academy At Ivy Ridge," https://www.forbes.com/sites/maryroeloffs/2024/03/13/the-program-docuseries-is-among-netflixs-most-watched-what-to-know-about-the-real-academy-at-ivy-ridge/?sh=1e2d13f113cf (accessed June 1, 2024 at 10:00 PM EST).

surreal to see Plaintiff in person "[k]nowing everything [Kubler] knew about [Plaintiff], the children he abused, the parents he conned, all the crimes he's gotten away with [. . . .]";[33]

      b.    Presenting Plaintiff as a murderer by saying people in the "higher ups" "get away with murder" while showing Plaintiff's picture next to a news article about murder at a youth program when the article in question had nothing to do with Plaintiff or any program Plaintiff had any degree of involvement with at any time;

      c.    Claiming Plaintiff had exercised direct control in youth programs with the aim or understood purpose of abusing children;

      d.    Presenting an arrest of Plaintiff as if Plaintiff was convicted of a crime of child abuse where no such conviction occurred and where Defendants intentionally and strategically omitted any mention of the fact Plaintiff was acquitted of any charges arising from this arrest;

      e.    Presenting statements that Plaintiff was effectively a mastermind and architect, along with his brother Robert, of an abusive system of youth programs;

      f.    All other instances of defamation articulated in this Complaint.

81.    The defamatory statements made by Defendants were published and disseminated publicly through Netflix's online services and various social media platforms, reaching many people throughout Utah, the United States, and globally.

82.    Defendants published these statements with the requisite degree of fault. Defendants acted negligently and with reckless disregard for the truth in publishing these false statements. They had no basis for believing the statements true and failed to conduct a reasonable investigation before widely disseminating such serious allegations. Defendants knew or had reason to know that these statements were false.

83.    These actions and statements by Defendants were false and malicious and caused

---

[33] *See* Production, Part 3, timestamp for time remaining at 18:02–17:52.

Plaintiff significant emotional distress, forming the basis of this complaint.

84.     The statements Defendants published concerning Plaintiff were not privileged.

85.     Defendants' false statements are defamation per se, partly because they attribute to Plaintiff the commission of a crime involving moral turpitude for which Plaintiff could be indicted. As such, Plaintiff is entitled to presumed damages.

86.     Because Defendants are guilty of oppression and malice, express and implied, they must pay Plaintiff an additional amount for the sake of example and by punishment.

87.     Plaintiff has suffered substantial injury to his reputation and standing in the community, as well as emotional distress, humiliation, embarrassment, and other damages as a direct and proximate result of Defendants' defamatory publications.

88.     Because Plaintiff has been obligated to procure the services of an attorney to protect his rights, Plaintiff is entitled to an award of all costs and attorney's fees.

## SECOND CAUSE OF ACTION
*Defamation – Against All Defendants*

89.     Plaintiff realleges and incorporates the allegations in each preceding paragraph of this Complaint as if fully set forth herein.

90.     Beginning in October 2022 and continuing to the present, Defendants have published and communicated false and defamatory statements about Plaintiff through Netflix's online services and various social media platforms. These statements are outlined in the foregoing paragraphs, and include but are not limited to:

a.     Claiming or taking action to distribute a media product where Defendant Kubler claims Plaintiff had "gotten away with this for so long [. . .]" seconds after saying it was surreal to see Plaintiff in person "[k]nowing everything [Kubler] knew about [Plaintiff], the

children he abused, the parents he conned, all the crimes he's gotten away with [. . . .]";[34]

      b.      Presenting Plaintiff as a murderer by saying people in the "higher ups" "get away with murder" while showing Plaintiff's picture next to a news article about murder at a youth program when the article in question had nothing to do with Plaintiff or any program Plaintiff had any degree of involvement with at any time;

      c.      Claiming Plaintiff had exercised direct control in youth programs with the aim or understood purpose of abusing children;

      d.      Presenting an arrest of Plaintiff as if Plaintiff was convicted of a crime of child abuse where no such conviction occurred and where Defendants intentionally and strategically omitted any mention of the fact Plaintiff was acquitted of any charges arising from this arrest;

      e.      Presenting statements that Plaintiff was effectively a mastermind and architect, along with his brother Robert, of an abusive system of youth programs;

      f.      All other instances of defamation articulated in this Complaint.

91.      The statements Defendants published about Plaintiff are false. Plaintiff has not engaged in any criminal, unethical, or prejudicial conduct alleged.

92.      The statements Defendants published about Plaintiff are defamatory.

93.      The statements Defendants published about Plaintiff are not privileged.

94.      The statements Defendants published about Plaintiff are made with the requisite degree of fault. Defendants published the false statements, knowing they were untrue or with reckless disregard for their truth, as evidenced by their persistence in repeating the allegations after Plaintiff took steps to stop the defamatory attacks.

95.      Defendants' statements were deliberately made with malice, aiming to subject the Plaintiff to public contempt, hatred, and ridicule.

---

[34] *See* Production, Part 3, timestamp for time remaining at 18:02–17:52.

96.     The false and defamatory statements were published to third parties, as they were publicly disseminated through Netflix's online services and social media platforms.

97.     Plaintiff has suffered injury to his reputation, emotional distress, and other damages as a direct and proximate result of Defendants' defamatory statements.

98.     Such injury has manifested, among other symptoms of anxiety and negative impact on quality of life, as anonymous online threats of violence, targeted group harassment campaigns, online and in-person hate, and being the victim of specific death threats across varying degrees of credibility and concern.

99.     The statements that Defendants published about Plaintiff caused damages to Plaintiff in an amount to be determined at trial.

100.    Because the Defendants are liable for oppression and malice, express or implied, she must pay Plaintiff an additional amount for the sake of example and by punishment. Plaintiff is entitled to punitive damages.

101.    Because Plaintiff has been obligated to procure the services of an attorney to protect his rights due to Defendants' acts, Plaintiff is entitled to an award of reasonable attorney fees as part of his damages.

## THIRD CAUSE OF ACTION
*False Light Invasion of Privacy – Against All Defendants*

102.    Plaintiff realleges and incorporates the allegations in each preceding paragraph of this Complaint as if fully set forth herein.

103.    The key elements necessary to state a false light claim are (1) the publication or broadcast of a false statement of fact that places the plaintiff in a false light in the public eye; (2) if the plaintiff is a public figure, a demonstration by clear and convincing evidence that the statement was published or broadcast with "actual malice," and (3) a demonstration that the publication or broadcast of the falsehood would be deemed "highly offensive to a reasonable person."

104.    The first two elements of the false light tort described above are identical to parallel elements for defamation. Both torts require falsity, and both torts require, at least for public figures, actual malice. Both elements are satisfied by the facts pled herein.

105.    Plaintiff is neither a public figure nor a quasi-public figure requiring "actual malice."

106.    However, the third crucial element of the false light tort is not identical to defamation, and the United States Supreme Court has differentiated the two torts on this ground. Unlike defamation, which requires proof of injury to reputation, false light does not require proof of defamatory harm. The false light tort substitutes for the defamation element requirement of damage to reputation, which is the requirement that the plaintiff, in a false light, establish that the falsehood is highly offensive to a reasonable person. In this case, the false statements and attributions outlined in the Defamatory Statements would be highly offensive to a reasonable person.

107.    Defendants publicized matters concerning Plaintiff that placed them before the public in a false light.

108.    The false light in which Plaintiff was placed due to Defendants' actions would be highly offensive to a reasonable person. To be publicly and falsely accused of murder, abuse, covering up rape and assault to protect abusers, participating in child trafficking, and other related condemnations would undoubtedly be highly offensive to a reasonable person.

109.    Defendants consistently manipulated the public narrative regarding Plaintiff by intentionally misrepresenting the facts they alleged or completely concocting stories with no factual basis.

110.    Defendants knew the falsity of the publicized matter and the false light in which Plaintiff was placed and had personal knowledge that their allegations about Plaintiff were false.

111.    As a proximate result of the foregoing, Plaintiff has suffered damages in an amount to be proven at trial and seeks actual and presumed damages.

112.     Defendants' conduct as described herein was done with a conscious disregard for the rights of Plaintiff, with intent to maliciously vex, annoy, and/or harass him, and with motives of fraud and oppression to exploit him for their gain. Such conduct was unauthorized and constitutes oppression, fraud, and/or malice, entitling Plaintiff to an award of punitive damages appropriate to set an example of Defendants in an amount determined at trial.

### FOURTH CAUSE OF ACTION
*Intentional Infliction of Emotional Distress – Against All Defendants*

113.     Plaintiff realleges and incorporates the allegations in each preceding paragraph of this Complaint as if fully set forth herein.

114.     In Utah, a plaintiff is entitled to damages where a defendant intentionally engaged in some conduct toward the plaintiff (a) with the purpose of inflicting emotional distress or (b) where any reasonable person would have known that such would result, and the defendant's actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality. *Camco Constr. Inc. v. Utah Baseball Acad. Inc.*, 2018 UT App 78, ¶ 12, 424 P.3d 1154, 1158.

115.     Defendants, either personally or through their agents, engaged in and subjected Plaintiff to outrageous and intolerable conduct offending generally accepted standards of decency and morality. Examples of this outrageous and intolerable conduct include but are not limited to:

      a.     Claiming or taking action to distribute a media product where Defendant Kubler claims Plaintiff had "gotten away with this for so long [. . .]" seconds after saying it was surreal to see Plaintiff in person "[k]nowing everything [Kubler] knew about [Plaintiff], the children he abused, the parents he conned, all the crimes he's gotten away with [. . . .]";[35]

      b.     Presenting Plaintiff as a murderer by saying people in the "higher ups" "get

---

[35] *See* Production, Part 3, timestamp for time remaining at 18:02–17:52.

away with murder" while showing Plaintiff's picture next to a news article about murder at a youth program when the article in question had nothing to do with Plaintiff or any program Plaintiff had any degree of involvement with at any time;

      c.    Claiming Plaintiff had exercised direct control in youth programs with the aim or understood purpose of abusing children;

      d.    Presenting an arrest of Plaintiff as if Plaintiff was convicted of a crime of child abuse by stating "[Plaintiff's youth program] was only open for about nineteen months before authorities were alerted to abuse, raided the facility, and [Plaintiff] was arrested]," where no such conviction or abuse occurred and where Defendants intentionally and strategically omitted any mention of the fact Plaintiff was acquitted of any charges arising from this arrest;[36]

      e.    Presenting statements that Plaintiff was effectively a mastermind and architect, along with his brother Robert, of an abusive system of youth programs;

      f.    All other instances of defamation articulated in this Complaint.

116.    The repeated and continuous nature of their conduct, which has not ceased since October 2022, continues to be spread through Netflix's online services and various social media platforms, with significant followings and audiences, which also amounts to extreme and outrageous behavior.

117.    Defendants' false statements were extreme and outrageous, going beyond all possible bounds of decency, and were intolerable in a civilized community. Defendants' statements were not only intended to inflict emotional harm but also sought to undermine Plaintiff's reputation within the community.

118.    Defendants acted with the intent to inflict emotional distress or knew that emotional distress was likely to result from their actions.

---

[36] *See* Production, Part 3, timestamp for time remaining at 35:33–35:10.

119.     Defendants' false statements were published to third parties verbally or in writing through Netflix's online services and various social media platforms.

120.     Defendants made these statements intending to harm Plaintiff, knowing them to be false, or with reckless disregard for their truth or falsity. Defendants' statements are provably false, as demonstrated in this Complaint.

121.     Defendants' conduct directly caused Plaintiff emotional distress. As a result of Defendants' false misrepresentations, Plaintiff and his family have received threats and harassment from his local community and Netflix's global audience. As a result, Plaintiff has been required to adjust many facets of his life due to the shame and revulsion directed at him and his family due to Defendants' conduct.

122.     Defendants' conduct also directly caused Plaintiff's emotional distress because Defendants' inflammatory and false statements caused Plaintiff to be in a hypervigilant state and be on constant alert for verbal altercations and potentially physical attacks from Defendants or Defendants' associates.

123.     As a direct result of Defendants' false publications, Plaintiff suffered severe emotional distress, including severe anxiety, humiliation, deep depression, and damage to his reputation. Plaintiff's severe emotional distress manifested itself in physical maladies, including stomach pain and nausea.

124.     This severe distress and resulting symptoms required treatment from medical professionals, which resulted in Plaintiff incurring medical expenses.

**FIFTH CAUSE OF ACTION**
*Injunctive Relief – Against All Defendants*

125.     Plaintiff realleges and incorporates the allegations in each preceding paragraph of this Complaint as if fully set forth herein.

126.     Plaintiff is entitled to an immediate injunctive relief that orders Defendants to remove

the Series from Netflix's online services and all social media posts and website articles that publish the aforementioned defamatory statements.

127.     Plaintiff has and will continue to suffer irreparable harm if an injunction is not issued in the form of their severely damaged reputation.

128.     There is a substantial likelihood that Plaintiff will prevail on the merits because there is evidence the Defendants' statements are wholly fabricated, knowingly false, and made with a reckless indifference to their veracity.

129.     Public policy favors Plaintiff as the false allegations against him have, and continue to, damage his reputation in the community and expose him to public revulsion, threats, and shaming.

130.     Plaintiff respectfully requests that an injunction be served immediately to all Defendants.

## SIXTH CAUSE OF ACTION
*Civil Conspiracy – Against All Defendants*

131.     Plaintiff realleges and incorporates the allegations in each preceding paragraph of this Complaint as if fully set forth herein.

132.     Defendants Netflix, Kubler, and several as-yet unidentified parties combined and conspired to produce and publish the Production to reach a global audience while making explicitly defamatory statements and framing Plaintiff in a defamatory and false light.

133.     Defendants had a common object and agreement to portray Plaintiff in a false and negative light and falsely accuse him of serious criminal conduct, including kidnapping, child abuse, and murder, to harm his reputation for their financial gain and notoriety from the Production.

134.     In furtherance of this common plan, Defendants engaged in numerous unlawful and overt acts, including: a) Making numerous demonstrably false statements of fact about Plaintiff, such as claiming youth programs he was involved with were raided by police and shut down for child abuse when they voluntarily closed, and directly implying Plaintiff was involved in a murder; b) Manipulating

and taking statements out of context through strategic editing to falsely portray Plaintiff as having committed crimes and abuse; c) Trespassing at former program locations to stage misleading scenes; d) Destroying evidence that could disprove their false allegations; e) Presenting so-called experts who made unsupported claims without any direct knowledge; and f) Using emotionally manipulative filmmaking techniques to lead viewers to false conclusions.

135.    Defendants engaged in these overt acts with malice and intent to injure Plaintiff by destroying his reputation with baseless criminal accusations presented as fact to a broad audience.

136.    Defendants also took measures to conceal the truth regarding the falsity of their claims made throughout the Program regarding allegations Plaintiff was an abuser and criminal, with representations Plaintiff had directly controlled or exercised influence to facilitate rampant abuse in several youth programs showcased in the Production, by intentionally destroying business records and other relevant materials created by the Academy at Ivy Ridge at or near the time Defendants' allegations of abuse were to have occurred.

137.    As a direct and proximate result of Defendants' conspiracy and wrongful actions, Plaintiff suffered significant damages, including his reputation and standing in the community and emotional distress.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all claims, causes of action, issues, and defenses properly triable before a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief against Defendants and each of them, as follows:

A.    For injunctive relief to order the removal of all defamatory and disparaging media publications and content, social media posts, website articles, and other public defamatory publications submitted by Defendants regarding Plaintiff;

B.       For temporary, preliminary, and permanent injunctive relief, restraining and enjoining Netflix, its agents, and all persons acting in concert with them from continuing to make the Defamatory Statements and to remove them from the Series;

C.       For actual and presumed damages in an amount to be determined at trial;

D.       For punitive damages;

E.       Pre and post-judgment interest;

F.       For costs of suit, including attorney's fees; and

G.       For such further relief as the Court deems just and proper.

**DATED:** June 25, 2024

*/s/ Christoffer T. Binning*
Christoffer T. Binning (UT-17942)
Michael K. Hepworth (UT-15157)
**HEPWORTH LEGAL**
*Counsel for Narvin Lichfield*