David W. Tufts (8736)
Ian M. Kinghorn (17717)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
david.tufts@dentons.com
ian.kinghorn@dentons.com

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
**DENTONS US LLP**
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
(312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.giannini@dentons.com

*Attorneys for Defendants Katherine Kubler and Netflix, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NARVIN LICHFIELD, an individual,<br><br>        Plaintiff,<br><br>vs.<br><br>KATHERINE KUBLER, an individual,<br>NETFLIX, INC., a Delaware Corporation,<br>and JOHN DOES A-L,<br><br>        Defendants. | **DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE PURSUANT TO ANTI-SLAPP ACTS**<br><br>Case No. 2:24-cv-00458-JNP-CMR<br><br>Judge Jill N. Parrish |

## **TABLE OF CONTENTS**

**Page**

RELIEF SOUGHT ................................................................................................... 1

INTRODUCTION ................................................................................................... 1

STANDARD ON RULE 12(B)(6) MOTION AND MATERIALS CONSIDERED ...................... 2

FACTUAL BACKGROUND ....................................................................................... 3

    A.    The Series and Documentarian Katherine Kubler ................................. 3

    B.    WWASP: The Lichfield Family Business ............................................. 4

    C.    Plaintiff's Career in the Controversial Troubled Teen Industry with WWASP ........................................................................................... 5

    D.    Plaintiff's Public Figure Status ........................................................... 5

    E.    This Lawsuit ...................................................................................... 7

ARGUMENT ......................................................................................................... 7

I.     PLAINTIFF'S CLAIMED DEFAMATIONS ARE NOT ACTIONABLE FOR MULTIPLE REASONS. ....................................................................................... 7

    A.    Plaintiff's Generalized Complaints About the Series Are Not "Of and Concerning" Him. ............................................................................... 8

    B.    Plaintiff's Allegations About Statements That Were Never Made Also Fail. ................................................................................................... 10

    C.    Any Statements That Were Actually Made About Plaintiff Are Not Actionable Under the First Amendment and Utah Law. ..................................... 11

        1.    Plaintiff's Admitted Involvement with WWASP Defeats Any Claim of Material Falsity—Which He Fails to Plead. ...................... 11

        2.    Ms. Kubler's Comments About Plaintiff "Getting Away" Without Accountability Are Non-Actionable Expressions of Her Opinion. ......... 14

        3.    The Series' Accurate Report of the Investigation of Plaintiff's Costa Rica Facility and His Arrest Is Non-Actionable and Privileged. ................................................................................. 20

    D.    Plaintiff's Claims Also Should Be Dismissed Because He Does Not—and Could Not—Plead Actual Malice. ....................................................... 23

II.    PLAINTIFF'S REMAINING TORT CLAIMS ARE DUPLICATIVE OF HIS DEFAMATION CLAIM AND FAIL AS A MATTER OF LAW. ................................... 25

III.     SINCE DISMISSAL IS IN ORDER AND THE CLAIMS ARE DIRECTED TO
         SPEECH ON A MATTER OF PUBLIC CONCERN, DEFENDANTS ALSO ARE
         ENTITLED TO RELIEF UNDER THE ANTI-SLAPP ACTS. ......................................... 27

CONCLUSION ............................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ampex Corp. v. Cargle*,
128 Cal. App. 4th 1569 (2005) ...............................................................28

*Anderson v. Cramlet*,
789 F.2d 840 (10th Cir. 1986) ................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................2, 25

*Bennett v. Jones, Waldo, Holbrook & McDonough*,
2003 UT 9, 70 P.3d 17 ...............................................................................26

*Biro v. Conde Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015) ...........................25

*Blatty v. N.Y. Times Co.*,
42 Cal.3d 1033 (1986) ................................................................................9

*Brokers' Choice of Am. v. NBC Universal*,
861 F.3d 1081 (10th Cir. 2017) ..............................................9, 11, 12, 21, 24

*Bustos v. A&E Television Net.*,
646 F.3d 762 (10th Cir. 2007) (Gorsuch, J.)..........................................13

*CACI Premier Technology, Inc. v. Rhodes*,
536 F.3d 280 (4th Cir. 2008) .............................................................19, 20

*Casper v. Washington Post Co.*,
549 F. Supp. 376 (E.D. Pa. 1982) ...........................................................21

*Chau v. Lewis*,
935 F. Supp. 2d 644 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014) ......................16, 17

*Couch v. Verizon Commc'ns Inc.*,
105 F.4th 425 (D.C. Cir. 2024)...........................................................23, 25

*CVB, Inc. v. Corsicana Mattress Co.*,
604 F. Supp. 3d 1264 (D. Utah 2022).......................................................9

*D'Addabbo v. Smith*,
2018 WL 5779077 (D. Utah Sept. 13, 2018)..........................................27

*Davidson v. Baird*,
   2019 UT App 8 ................................................................................18, 23, 26

*Deripaska v. Assoc. Press*,
   282 F. Supp. 3d 133 (D.D.C. 2017) ...............................................13, 19

*Diamond Ranch Academy, Inc. v. Filer*,
   117 F. Supp. 3d 1313 (D. Utah 2015)............................................22, 27

*Diamond Ranch Academy, Inc. v. Filer*,
   2016 WL 633351 (D. Utah Feb. 17, 2016) ...............................24, 27, 28

*Dorsey v. Nat'l Enquirer*,
   973 F.2d 1431 (9th Cir. 1992) ...............................................................22

*Eliott v. Lions Gate Ent'mnt*,
   639 F. Supp. 3d 1012 (S.D. Cal. 2022) .................................................13

*Ferlauto v. Hamsher*,
   74 Cal. App. 4th 1394 (1999) ...............................................................18

*Friedman v. Kennard*,
   248 F. App'x 918 (10th Cir. 2007) .......................................................12

*Gallagher v. Philipps*,
   563 F. Supp. 3d 1048 (S.D. Cal. 2021).................................................22

*GFF Corp. v. Assoc. Wholesale Grocers, Inc.*,
   130 F.3d 1381 (10th Cir. 1997) ..............................................................2

*Gilbert v. Sykes*,
   147 Cal. App. 4th 13 (2007) .................................................................28

*Global Relief Found. v. N.Y. Times Co.*,
   390 F.3d 973 (7th Cir. 2004) .................................................................21

*Goguen v. NYP Holdings, Inc.*,
   544 P. 3d 868 (Mont. 2024) ..................................................................22

*Greenbelt Coop. Pub. Ass'n v. Bresler*,
   398 U.S. 6 (1970)...................................................................................20

*Hogan v. Winder*,
   762 F. 3d 1096 (10th Cir. 2014) ...............................................14, 18, 19

*Hustler Magazine v. Falwell*,
   485 U.S. 46 (1988).................................................................................26

iv

*Immanuel v. Cable News Network, Inc.*,
   618 F. Supp. 3d 557 (S.D. Tex. 2022) ................................................................17

*Jarrow Formulas, Inc. v. LaMarche*,
   31 Cal.4th 728 (2003) ........................................................................................28

*Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Inv. Servs.*,
   175 F. 3d 848 (10th Cir. 1999) ....................................................................15, 17

*Keisel v. Westbrook*,
   2023 UT App 163 ....................................................................................10, 17, 26

*Kennedy v. Peele*,
   552 F. App'x 787 (10th Cir. 2014) ......................................................................2

*Kinsey v. N.Y. Times Co.*,
   991 F.3d 171 (2d Cir. 2021)................................................................................22

*LifeVantage Corporation v. Domingo*,
   2016 WL 4705540 (D. Utah Sept. 8, 2016) (Parrish, J.) ..............................13, 27

*Lott v. Levitt*,
   556 F.3d 564 (7th Cir. 2009) ...............................................................................2

*Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*,
   810 F.3d 1161 (10th Cir. 2016) ..........................................................................12

*Martin v. Hearst Corp.*,
   777 F.3d 546 (2d Cir. 2015)................................................................................21

*Martineau v. Currutt*,
   2022 WL 180735 (D. Utah Jan. 19, 2022) (Parrish, J.) ......................................12

*Masson v. New Yorker Mag.*,
   501 U.S. 496 (1991)............................................................................................12

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
   674 F.3d 369 (4th Cir. 2012) ..............................................................................25

*McClatchy Newsp. v. Superior Court*,
   189 Cal. App. 3d 961 (1987) ..............................................................................22

*Milkovich v. Lorain Jour.*,
   497 U.S. 1 (1990)..........................................................................................15, 16

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964)............................................................................................23

*Nunes v. Rushton*,
  299 F. Supp. 3d 1216 (D. Utah 2018) (Parrish, J.) ................................................2, 9, 16, 17

*Partington v. Bugliosi*,
  56 F.3d 1147 (9th Cir. 1995) .............................................................................10, 16, 17

*Paterno v. Superior Court*,
  163 Cal. App. 4th 1342 (2008) ........................................................................................22

*Peterson v. Grisham*,
  2008 WL 4363653 (E.D. Okla. Sept. 17, 2008), *aff'd*, 594 F.3d 723 (10th Cir.
  2010) ........................................................................................................................15

*Phila. Newsp., Inc. v. Hepps*,
  475 U.S. 767 (1986) ........................................................................................................11

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
  890 F.3d 828 (9th Cir. 2018) ...........................................................................................28

*Porter v. Staples the Office Superstore*,
  521 F. Supp. 3d 1154 (D. Utah 2021) (Parrish, J.) .......................................................26

*Resolute Forest Prods. v. Greenpeace Int'l*,
  302 F. Supp. 3d 1005 (N.D. Cal. 2017) ....................................................................28, 29

*Rinsley v. Brandt*,
  700 F.2d 1304 (10th Cir. 1983) ..................................................................................18, 20

*Sipple v. Found. for Nat'l Progress*,
  71 Cal. App. 4th 226 (1999) ...........................................................................................22

*Smith v. Press Democrat*,
  2011 WL 5006463 (N.D. Cal. 2011) ...............................................................................22

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) ........................................................................................................25

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
  864 F.3d 236 (2d Cir. 2017) ............................................................................................12

*Vowell v. Gannett Sat. Info. Net.*,
  2017 WL 499942 (D. Utah Feb. 7, 2017) .......................................................................13

*West v. Thomson Newsp.*,
  872 P.2d 999 (Utah 1994) .........................................................................................7, 9, 14

*Westmont Residential LLC v. Buttars*,
  2014 UT App 291 ............................................................................................................16

*White v. Ockey*,
  2006 WL 2323093 (D. Utah Aug. 9, 2006) ................................................................12

*Wilkow v. Forbes, Inc.*,
  2000 WL 631344 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir. 2001) ...................22

*World Wide Ass'n of Specialty Programs v. Pure, Inc.*,
  450 F.3d 1132 (10th Cir. 2006) ................................................................4, 24, 28

**Statutes**

Cal. C.C.P. § 425.16 ................................................................1, 27, 30

Cal. Civ. Code § 47(d) ................................................................21, 22

Utah Code Ann. § 45-2-3(4) ................................................................22

Utah Code Ann. § 78B-25-102 ................................................................27

Utah Code Ann. § 78B-25-107 ................................................................28

Utah Code Ann. § 78B-25-110 ................................................................27

**RELIEF SOUGHT**

Defendants move to dismiss the First Amended Complaint ("FAC") with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) because it fails to state a cause of action as a matter of law, and to strike the FAC pursuant to the California Anti-SLAPP Act, Cal. C.C.P. § 425.16, or alternatively, the Uniform Public Expression Protection Act, Utah Code Ann. § 78B-25-101, *et seq.* (the "Anti-SLAPP Acts"), and award attorneys' fees.

**INTRODUCTION**

This case involves protected First Amendment speech on a matter of public concern. Defendant Katherine Kubler's documentary series, *The Program: Cons, Cults and Kidnapping* ("The Program" or the "Series"), describes the first-hand experiences of Ms. Kubler and others who were interned in facilities for "troubled teens" that were part of a network known as the "World Wide Association of Specialty Programs and Schools" ("WWASP"). WWASP was founded, owned and operated by Plaintiff Narvin Lichfield's brother. Plaintiff, a prominent figure in the controversial "troubled teen industry", who admits he ran WWASP programs, filed this lawsuit to punish and censor Ms. Kubler from telling her story and expressing her opinions. His claims fail as a matter of law. The Series provides exactly the kind of perspective on contentious subjects that is protected by constitutional free speech guarantees.

The Series, which streams on Netflix, is a memoir and a documentary; haunted by her experience at one of the WWASP facilities, the "Academy at Ivy Ridge" in New York, Ms. Kubler sets out to (1) explain the troubled teen industry; (2) explore others' experiences at WWASP facilities; and (3) identify the individuals who ran and profited from the WWASP institutions. The Series details Ms. Kubler's investigative findings and presents her critiques and opinions that these programs are abusive and ruined lives. The Series also shows that Ms. Kubler's opinions are shared by others— including state and federal officials, experts, and other victims who as adults are now speaking out.

Under both Utah law and the First Amendment, the Series' recitation of Kubler's and others' experiences, and generalized criticism of WWASP, cannot be the basis of a defamation claim by Plaintiff. For this and multiple independent reasons, Plaintiff's claims fail as a matter of law.

## STANDARD ON RULE 12(B)(6) MOTION AND MATERIALS CONSIDERED

The Court begins by considering the well-pleaded facts, to decide "whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Conclusory allegations must be disregarded (*id*. at 678–679), and the Court need not "take the plaintiff's *interpretation* of the allegedly defamatory words at face value." *Lott v. Levitt*, 556 F.3d 564, 569 (7th Cir. 2009). Instead, the First Amendment requires the Court to conduct "a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation without 'indulging inferences in favor of the nonmoving party.'" *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1233 (D. Utah 2018) (Parrish, J.) (citations omitted).

The court will "ordinarily examine . . . documents incorporated into the complaint by reference" and "matters of which a court may take judicial notice." *Kennedy v. Peele*, 552 F. App'x 787, 792 (10th Cir. 2014) (citations omitted). Defendants request the Court take judicial notice of material incorporated into the FAC—including the entirety of the three-part Series. *See* Request for Judicial Notice and exhibits.[1] Any allegations that contradict such materials need not be taken as true. *GFF Corp. v. Assoc. Wholesale Grocers, Inc.,* 130 F.3d 1381, 1385 (10th Cir. 1997) ("[F]actual allegations that contradict such a properly considered document are not well-pleaded facts").

---

[1] This joint motion to dismiss and strike does not require the Court to go outside what is appropriate for review on a Rule 12(b)(6) motion; and since the Complaint fails to state a claim under Rule 12(b)(6), Defendants also are entitled to relief on the motion to strike as a matter of law. Defendants submit herewith the Declaration of Katherine Kubler solely to support their additional argument on the Motion to Strike that Plaintiff could never plausibly plead a false statement of fact (given his admissions and the public record), or actual malice (given Ms. Kubler's extensive research and personal experiences). The Court need not reach these additional arguments if it finds Plaintiff failed to state a claim under Rule 12(b)(6).

## FACTUAL BACKGROUND

### A.      The Series and Documentarian Katherine Kubler

*The Program: Cons, Cults and Kidnapping* was released on Netflix on March 5, 2024. (FAC ¶ 71.) The three-part docuseries explores Ms. Kubler's and other survivors' experiences at the behavior modification center for teens in upstate New York called The Academy at Ivy Ridge ("Ivy Ridge"), and unravels the tangled web of the "troubled teen industry". (Series, Exs. 1A–1C.) The Series also discusses the now-defunct organization known as WWASP, which was a major player in the industry. (*Id.*)

In 2004, as a sophomore in high school, Ms. Kubler was sent to Ivy Ridge. (Ex. 1A, Episode 1 at 6:55–7:35.) In Ms. Kubler's experience at Ivy Ridge, students were forced to follow draconian rules and were not allowed to conduct basic activities, such as, go outside, talk to each other, look out the window, make eye contact, or even smile. (*Id.* at 8:05–8:55, 12:45–14:50.) Students were assigned points and levels depending on their behavior, and could only exit the program by accumulating enough points (and by not losing points for supposed infractions). (*Id.* at 15:12–16:16.) Ms. Kubler spent 15 months at Ivy Ridge and was traumatized by her experience. (*Id.* at 46:45.)

Episode 1 of the Series focuses on Ms. Kubler's experience at Ivy Ridge and the experiences of other survivors. Episode 2 focuses on the seminars at Ivy Ridge and other tactics the program used to keep teens enrolled. Plaintiff Lichfield is not mentioned in the first two episodes. In Episode 3, which focuses on WWASP and the troubled teen industry more broadly, Ms. Kubler explores who was profiting from the various WWASP programs and the connections between facilities, including facilities with which Plaintiff was involved. (FAC ¶ 9.)

3

The Series was produced in California, where the creation, editing and pre- and post-production took place (Kubler Decl. ¶¶ 40–43), and where, at the time the Series was published, all Defendants resided. (FAC ¶¶ 2–3.)

### B.    WWASP: The Lichfield Family Business

As has been widely reported, during its operation, WWASP was "an association of residential treatment programs for troubled and at-risk teenagers." *World Wide Ass'n of Specialty Programs v. Pure, Inc*., 450 F.3d 1132, 1135 (10th Cir. 2006) ("*Pure, Inc*.") (Ex. 19.) It did "not own or operate schools; rather, it market[ed] its members' schools to parents who might be interested in them." *Id*. WWASP was formed in Utah in 1997 by three trustees—Robert B. Lichfield (Plaintiff's brother (FAC ¶ 77e)), Brent M. Facer and J. Ralph Atkin. (Ex. 17, WWASP Articles of Incorporation.)

As was well known, Ivy Ridge was one of WWASP's member programs. (Ex. 2, Letta Tayler, *Too-Tough Love?; Authorities raid academy; owner investigated over mistreatment*, Newsday, May 25, 2003.) In 2005, Ivy Ridge was fined by the New York Attorney General for falsely marketing to parents that it awarded accredited high school diplomas when it had no such accreditation and was handing out fake diplomas. (Ex. 16, Assurance of Discontinuance.) WWASP also faced widespread allegations of abuse at its member programs. As the Tenth Circuit noted:

> Around this time, television programs and print articles were describing abuse and neglect at [WWASP] schools. For example, the news magazine 48 Hours reported a child's allegation that he had been handcuffed for two consecutive days and had his mouth covered in duct tape. The Miami Herald ran an article describing a mother's report that her teenager came home from a [WWASP] school with ringworm scars and chemical burns. Forbes Magazine reported that children were punched, kicked, thrown, and forced to sit on cement floors for twelve hours at a time. The teenager quoted in the article also claimed that students who tried to flee from such punishment were locked in a small cell for days.

*Pure, Inc*., 450 F.3d at 1135–36. WWASP dissolved operations in 2016. (Ex. 18, Articles of Dissolution.)

4

### C.   Plaintiff's Career in the Controversial Troubled Teen Industry with WWASP

Plaintiff concedes that he has been "involved in operating programs for troubled youth for over thirty-two (32) years" (FAC ¶¶ 8, 55.); he has had an "association with WWASP" as a "franchisee"; and that his "programs had to pay dues to WWASP for membership." (*Id.* ¶ 44.) Plaintiff also admits his involvement in the "staffing, supervision, or directing of . . . youth program(s)" (*id.* ¶ 27) working with more than 36,000 teens (*id.* ¶ 55).

Earlier this year, Plaintiff appeared on several episodes of the podcast "Trapped in Treatment," to discuss his career in the troubled teen industry. Plaintiff freely admits he began his career in the troubled teen business working for the marketing arm of his brother's troubled teen enterprise. (Ex. 15A, Trapped in Treatment Episode 3 at 15:33–18:54; *see also* Defs. Judicial Notice, and cases cited.)

In the early 2000s, Plaintiff moved on to owning and operating his own WWASP facilities. He opened his first facility, Carolina Springs Academy, in South Carolina as a "franchisee" of his brother Robert's enterprise. (FAC ¶ 44; Ex. 15B, Trapped in Treatment Episode 10 at 5:47–7:59.) He later opened Dundee Ranch Academy in Costa Rica.  (Ex. 2, Tayler.)

In May 2003, Plaintiff was arrested in Costa Rica when Dundee Ranch was raided by Costa Rican authorities investigating abuse. (FAC ¶¶ 61–63; Ex. 3, *School owner arrested in abuse case*, Tampa Bay Times, May 24, 2003; Ex. 4, Tim Weiner, *U.S. Youths Rebel at Harsh School in Costa Rica and Many Head for Home*, The New York Times, May 27, 2003.)

### D.   Plaintiff's Public Figure Status

For nearly the entirety of his career, Plaintiff has publicly promoted his work with WWASP and has defended the centers against allegations of abuse. After he was arrested in Costa Rica, Plaintiff gave Inside Edition an interview and tour of the Dundee Ranch facility. (Ex. 14, Inside Edition; *see also* Ex. 1C, Episode 3 of the Series at 25:00–25:05.) He further defended himself and

Dundee Ranch in the media, claiming that "there was no abuse at all at Academy Dundee. We never held any kids there against their will. I was like Uncle Buck to those kids." (Ex. 5, James Varney, *Tough love school sent to timeout; Academy's doors closed indefinitely*, Times-Picayune, June 25, 2003.)

Plaintiff called his "high impact" behavioral modification methods—which reportedly included "tactics such as making students walk 100 miles around a track under the hot Pacific sun to earn their 'freedom,' or forcing them to spend up to five days in 'solitary confinement' as punishment for looking out of the window during a lesson"—"no different from any boarding school in England." (Ex. 6, Adam Williams, *Costa Rica government closes controversial 'tough love' youth camp*, The Tico Times, March 22, 2011; *see also* Ex. 7, Tim Rogers, *'Tough Love' Teen Facility Under Fire*,' The Tico Times, October 25, 2002). According to Plaintiff, following his 2003 arrest, he was "the poster child of abuse". (Ex. 15B, Trapped in Treatment Episode 10 at 21:33–22:18.)

A few months after his May 2003 arrest, it was reported that Plaintiff was ordered by the South Carolina Department of Social Services to stay away from his program in South Carolina, Carolina Springs Academy, pending the Costa Rican charges. (Ex. 8, Toby Hayes, *Utah-based school owner banned; Campuses in S.C., elsewhere cited with abuse*, Deseret News, July 6, 2003; Ex. 13, Maia Szalavitz, *Help at Any Cost*, at p. 145; Ex. 9, Tim Rogers, *Owner: Dundee Will Return*, The Tico Times, July 11, 2003.) Plaintiff called it a "witch hunt".  (Ex. 10, Tim Smith, *Youth home president says he's target of 'witch hunt*,' The Greenville News, August 22, 2003.)

Plaintiff admits that he has "a bit of a persecution complex," noting that "after everybody starts shooting at you, you learn to duck your head." (Ex. 11, Kirk Brown, *School of Troubles: Another chance for abandoned boarding school*, Independent Mail, December 10, 2010.) When Plaintiff later opened a new facility in South Carolina, he used an "alias" he called his "stage name"

"Nate Browning" because his "name has been destroyed on the Internet." (Ex. 12, Kirk Brown, *Second-chance school in Abbeville County*, Anderson Independent-Mail, May 4, 2014.)

Plaintiff continues to defend his controversial methods, despite the blowback it has caused him personally. (Ex. 15B, Trapped in Treatment Episode 10 at 10:51–11:57.) In his interview on a podcast earlier this year, Plaintiff admitted that "I rarely look up myself on the internet, you know, because I already know what's there." (*Id.* at 23:07–23:23.)

### E. This Lawsuit

Plaintiff alleges five causes of action against Netflix and Ms. Kubler: (1) defamation per se; (2) defamation; (3) false light invasion of privacy; (4) intentional infliction of emotional distress; (5) injunctive relief; and (5) civil conspiracy. (ECF No. 5, FAC.) The FAC contains pages upon pages about matters not relevant to Plaintiff, and at the end, recites five statements on which Plaintiff actually bases his claims. *See* FAC, *passim* and, *e.g.*, ¶¶ 77 (a)–(e).

## ARGUMENT

## I. PLAINTIFF'S CLAIMED DEFAMATIONS ARE NOT ACTIONABLE FOR MULTIPLE REASONS.

"[T]o state a claim for defamation" plaintiff must show that defendants published statements "*concerning him*, that the statements were *false, defamatory, and not subject to any privilege*, that the statements were published with the requisite *degree of fault*, and that their publication resulted in damage." *West v. Thomson Newsp.*, 872 P.2d 999, 1007–08 (Utah 1994) (emphasis added). Plaintiff's FAC fails as a matter of law on all counts.

*First*, many of the allegedly defamatory statements are not actionable because they are not about Plaintiff. Several challenged statements are from Episodes 1 and 2, which never even mention Plaintiff. Statements that are not about Plaintiff (*e.g.*, that are about WWASP generally) are not actionable because "to state a claim for defamation," Plaintiff must show that Defendants' statements were "*concerning him*" specifically. *West*, 872 P.2d at 1007 (emphasis added).

*Second*, a number of challenged statements are not actual statements from the Series. Plaintiff cannot state claims based on his own interpretation of the Series. The FAC is rife with invented statements that simply do not appear in the Series.

*Third*, even for those statements from the Series that do exist and were about Plaintiff, they also fail as a matter of law. To the extent statements in the Series connect him with WWASP programs, that connection is true by his own admission, and cannot be the basis of any claim. (*See e.g.* FAC ¶¶ 77c, e.) Certain of the statements—*e.g.*, about Plaintiff having "gotten away with this for so long . . . the children he abused, the parents he conned, all the crimes he's gotten away with" (FAC ¶ 77a); and "people in the 'higher ups' '[seem to] get away with murder'" (FAC ¶ 77b)—constitute non-actionable opinions and hyperbolic expressions. Likewise, the statements relating to Plaintiff's Costa Rica arrest—which Plaintiff exaggerates in his FAC—are true, and also protected by the fair report privilege. (FAC ¶ 77d.) And all of these statements are also not actionable because Plaintiff is a public figure on this controversial topic and must prove the fault standard of actual malice, which Plaintiff does not (and cannot) even plead.

### A. Plaintiff's Generalized Complaints About the Series Are Not "Of and Concerning" Him.

As a threshold matter, much of the Complaint is devoted to disputing the Series' searing first-person point of view about the harm caused by WWASP and other "troubled teen" programs. For example, the FAC challenges:

- scenes and statements from the Series that generally comment on WWASP, Ivy Ridge, or the business of for-profit schools for troubled teens (*see, e.g.,* FAC ¶¶ 36–37, 40–41, 50–60); and

- the Series' criticism of "youth programs" *generally*. *Id.* ¶ 59 (asserting that the Series' "claims about the youth programs . . . defamed the youth programs and Narvin by association").

None of these criticisms are actionable because they do not specifically concern Plaintiff. It is axiomatic that "to state a claim for defamation," plaintiff must show that defendants'

statements were "*concerning him*" specifically. *West*, 872 P.2d at 1007 (emphasis added).[2] This is not just a rule of state law, but "derives directly and ultimately from the First Amendment." *Blatty v. N.Y. Times Co.*, 42 Cal.3d 1033, 1042 (1986) (citing *Rosenblatt v. Baer*, 383 U.S. 75, 83 (1966) and *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 256, 262 (1964)).[3] Plaintiff is "required to show *specific reference*" to him. *Id.* The reason is clear: "[T]he absence of the 'of and concerning' requirement 'could invite any number of vexatious lawsuits and seriously interfere with public discussion of issues, or groups, which are in the public eye. . . . Such suits would be especially damaging to the media, and could result in the public receiving less information about topics of general concern.'" *Id.* at 1044. That public policy exists precisely for lawsuits like this one.

Under the First Amendment, Plaintiff cannot ask the court, in the guise of a defamation claim, to silence the viewpoints of Ms. Kubler and other youths who feel strongly that their lives were ruined by WWASP "youth programs". Plaintiff's attempt to use defamation law to muzzle and rewrite Ms. Kubler's story is manifest in his claim that the Series "conflated Kubler's personal family issues and poor academic performance before attending the program with alleged 'abuse' at the program" in order to "defame Narvin and others she targeted." (FAC ¶ 60.)

Furthermore, even if these statements were "of and concerning" Plaintiff, the Series' criticism of these programs generally (as challenged by Plaintiff throughout the FAC, *see supra*) would still be constitutionally protected as opinion.  Much of what is depicted is simply historical truth—*e.g*., instances of physical abuse, captured on video—and the first person accounts of Ms.

---

[2] *Nunes,* 299 F. Supp. 3d at 1233–34 (plaintiff "must show that [the] defendant[ ] published . . . statements concerning him [or her]", statements that only "indirectly concerned Nunes" were not actionable); *CVB, Inc. v. Corsicana Mattress Co.*, 604 F. Supp. 3d 1264, 1305–06 (D. Utah 2022) (rejecting conclusory argument that plaintiff was "the intended subject" of statement that summarized harm to industry; "[t]his is insufficient to show the statement plausibly referred especially to" plaintiff).

[3] Given the constitutional mandate of the First Amendment, *Brokers' Choice of Am. v. NBC Universal*, 861 F.3d 1081, 1104 (10th Cir. 2017), the body of federal and state case law throughout the country applying it to state defamation law claims is instructive.

Kubler and other survivors. Plaintiff may disagree with Ms. Kubler's belief that these programs abuse children, and with her use of pointed language to express that view, but the First Amendment and Utah Constitution protect Ms. Kubler's right to tell her story in her own words. "'Because expressions of pure opinion fuel the marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for defamation liability" under the Utah Constitution and First Amendment. This is especially true in this case, because "this protection is even more pronounced in matters of public concern.'" *Keisel v. Westbrook*, 2023 UT App 163 ¶ 36 (quoting *West*, 872 P.2d at 1013–15). *See infra*, Section I.C.

The Series is exactly the kind of perspective on controversial subjects that constitutional free speech guarantees: "When, as here, an author writing about a controversial occurrence fairly describes the general events involved and offers [her] personal perspective about some of its ambiguities and disputed facts, [her] statements should generally be protected by the First Amendment"; otherwise, "figures closely involved in a public controversy, or others whose perspectives might be of interest to the public" would be denied a voice, and "the robust debate among people with different viewpoints that is a vital part of our democracy would surely be hampered." *Partington v. Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1995).

**B.    Plaintiff's Allegations About Statements That Were Never Made Also Fail.**

Plaintiff claims the Series states that he "exercised direct control" in youth programs (FAC ¶ 77c)—namely, Ivy Ridge—in which he had no "actual executive control over the staffing and day-to-day operation." (*Id.* ¶¶ 13, 32.)  But the Series never says that Plaintiff operated Ivy Ridge, or staffed or supervised Ivy Ridge. He professes in lawyerly fashion that he was never "involved in the staffing, supervision, or directing of a youth program that was formally and judicially found to involve child abuse as defined by any legal standard while he acted in such a role." (*Id.* ¶ 27.) But again, the Series doesn't say he was.

As for those programs that *were* identified as supervised by Plaintiff—in Costa Rica and South Carolina—the Series does not state what Plaintiff claims it does in his allegations. (FAC ¶ 77c.) Nor does the Series go beyond the truthful public record fact that the Costa Rica facility was raided and he was arrested. *See* discussion *infra*, Section I.C.2. Plaintiff does not plead (nor could he) that he was not involved with either of those programs.

Another statement Plaintiff makes up is that he was "a mastermind and architect, along with his brother Robert, of an abusive system of youth programs." (FAC ¶ 77e.) Again, the Series says no such thing. *Robert*, not Narvin Lichfield, is presented as the WWASP mastermind; the Series highlights how Robert set up the whole web of WWASP entities and profited from them. (Ex. 1C, Episode 3 at 17:30–18:00 (repeating Robert Lichfield's name in connection with WWASP's formation a number of times and describing Robert as "Founder and Owner"); *id*. at 35:20–35:40 (referring to Robert as "the guy who created it all").)

C. **Any Statements That Were Actually Made About Plaintiff Are Not Actionable Under the First Amendment and Utah Law.**

Plaintiff's challenges to statements that are actually about him also fail for three independent reasons.

1. **Plaintiff's Admitted Involvement with WWASP Defeats Any Claim of Material Falsity—Which He Fails to Plead.**

To begin, a plaintiff "must shoulder the burden in his case-in-chief of proving the *falsity* of a challenged statement if he is a public figure or the statement involves a matter of public concern." *Brokers' Choice of Am. v. NBC Universal*, 861 F.3d 1081, 1107 (10th Cir. 2017) (citation omitted); *see Phila. Newsp., Inc. v. Hepps*, 475 U.S. 767, 775 (1986). Here, there is no question the Series is a matter of public concern, and Plaintiff is a limited purpose public figure. Thus, to meet his burden, "plaintiff must show the statement is not only false, but 'materially false,'" that is, "likely to cause reasonable people to think 'significantly less favorably' about the

plaintiff than they would if they knew the truth." *Brokers' Choice*, 861 F.3d at 1107 (affirming dismissal, citations omitted); *Masson v. New Yorker Mag.*, 501 U.S. 496, 517 (1991) ("Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified'" (citation omitted)).

Here, Plaintiff complains that the Series misstates his involvement with WWASP (*e.g.,* FAC ¶¶ 77c, e), yet concedes that the "gist" of comments about him are substantially true, and fails to allege facts proving material falsity. The FAC not only fails to provide allegations specific to falsity but omits direct assertions of underlying falsity for many purportedly defamatory statements. "[W]hen falsity is an element of a state defamation claim, federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) (affirming dismissal).[4]

Plainly put, Plaintiff *does not and could not challenge the truth of statements about his role in and links to WWASP*. Plaintiff *admits* that he has been "involved in operating programs for troubled youth for over thirty-two (32) years" (FAC ¶ 8); that this is his "career" (*id.* ¶ 55); and that it has been spent in the Lichfield family business—WWASP. *See id.* ¶ 14 (referring to "youth programs Narvin and his family were associated with"). Plaintiff further admits that he and the programs he ran were associated with WWASP and he profited from that association as a "franchisee" to whom WWASP referred clients. *See id.* ¶¶ 43–44. The gist of what the Series says is no different:  that Plaintiff was associated with the WWASP network of "youth programs" and made money from them. *See Friedman v. Kennard*, 248 F. App'x 918, 921 (10th Cir. 2007) (dismissal proper where plaintiff's "own pleading tend[ed] to defeat his claim"); *Martineau v.*

---

[4]  *See, e.g., Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1185 (10th Cir. 2016) (affirming dismissal of defamation claim where plaintiff failed to allege facts supporting falsity); *White v. Ockey*, 2006 WL 2323093, at *4 (D. Utah Aug. 9, 2006) ("Plaintiff failed to plead that the statements were false. Therefore, Plaintiff's defamation claim must be dismissed").

*Currutt*, 2022 WL 180735, at *5 (D. Utah Jan. 19, 2022) (Parrish, J.) (complaint's "contradictory factual assertions render [plaintiff's] defamation per se claim inherently implausible"); *see also Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133, 146 (D.D.C. 2017) (where Plaintiff "does not deny" and there is "readily available, judicially noticeable information" that he "openly associates himself with [an entity like WWASP]," for Defendants "to do the same cannot be defamatory") (dismissing complaint).

Nor is it false (much less materially so) to say that "Narvin used profits from WWASP and affiliated programs to pay for an expensive home in St. George, Utah, along with other expensive assets." (FAC ¶ 45.) Again, Plaintiff admits his programs were affiliated with WWASP, that his career and business was running those programs, and he *does not plead* (because he cannot) that he did not buy homes and other assets with money from his business.[5]

In more hairsplitting, Plaintiff asserts that he was a WWASP "franchisee" who did not technically share in WWASP corporate profits (*id.* ¶ 44), but the Series doesn't make that claim, and even if it did, that would not establish material falsity as a matter of law. *See Bustos v. A&E Television Net.*, 646 F.3d 762, 764, 765, 767 (10th Cir. 2007) (Gorsuch, J.) (holding that reference to plaintiff as "member" rather than "affiliate" of prison gang was not a material falsehood).[6]

---

[5] That's not defamatory in any event. *Cf. LifeVantage Corporation v. Domingo,* 2016 WL 4705540, at *7 (D. Utah Sept. 8, 2016) (Parrish, J.) ("[M]erely calling a person selfish or self-serving in his or her business dealings, without more, cannot be defamatory.").

[6] *See also Vowell v. Gannett Sat. Info. Net.*, 2017 WL 499942, at *1-3 (D. Utah Feb. 7, 2017) (dismissing claim alleging that by incorrectly labeling plaintiff a "defendant" in FTC case, article "effectively characterized him as an alleged scam artist who stole millions of dollars," where "the truth is that he was allegedly helping an alleged scam artist" hide funds; there is "little material difference between the reputational harm"); *Eliott v. Lions Gate Ent'mnt*, 639 F. Supp. 3d 1012, 1026 (S.D. Cal. 2022) (noting that the "only explicit statements made about Plaintiff" in docuseries about NXIVM group "assert that he was a NXIVM recruiter and instructor. These cannot be defamatory because they are true").

In sum, the gist of the core factual assertion relating to Plaintiff is that he was associated with WWASP and made money from controversial WWASP programs that faced allegations of abuse, including by his own son, and were shut down.  That gist is unassailably true.

### 2.	Ms. Kubler's Comments About Plaintiff "Getting Away" Without Accountability Are Non-Actionable Expressions of Her Opinion.

Other challenged statements—for example, Ms. Kubler's emotional and figurative expressions about "all the crimes" Plaintiff has "gotten away with" and that he "got away with murder" (FAC ¶ 77a, b)—are nonactionable as a matter of law for multiple reasons. These statements not only lack defamatory meaning in the context of the Series, but also are subjective expressions of opinion, conjectural hyperbole, and conclusions drawn from disclosed facts that are protected under Utah law and the First Amendment.

### a.	Context is Key

"[D]efamatory meaning is a matter of context. . . . If the context makes clear a reasonable reader would not accept the statements at face value, the statements do not cause damage to the plaintiff's reputation and are therefore not defamatory." *Hogan v. Winder*, 762 F. 3d 1096, 1106 (10th Cir. 2014) (citing *Mast v. Overson*, 971 P.2d 928, 933 (Utah Ct. App. 1998)); *West*, 872 P.2d at 1009–10 (explaining that a statement in context of a "traditional source of harsh political invective" is "less likely" to be read as defamatory).

Likewise, in determining as a matter of law whether a statement is protected opinion, Utah courts consider the "totality of the circumstances," including: "(i) the common usage or meaning of the words used; (ii) whether the statement is capable of being objectively verified as true or false; (iii) the full context of the statement—for example, the entire article or column—in which the defamatory statement is made; and (iv) the broader setting in which the statement appears." *West*,

872 P.2d at 1018 (citing *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984)).[7]

Regarding the last two factors—the general "context and the broader setting in which the statements were made,"—""[s]ome types of writing or speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.'" *Id.* at 1019–20 (citation omitted). Here, a review of the Series as a whole shows it is a personal story with a strong point of view, and the broad context and general tenor of the Series signals opinion. "Where the tone of a piece is 'pointed, exaggerated and heavily laden with emotional rhetoric and moral outrage,' readers are notified 'to expect speculation and personal judgment.'" *Peterson v. Grisham*, 2008 WL 4363653, at *3 (E.D. Okla. Sept. 17, 2008), *aff'd*, 594 F.3d 723 (10th Cir. 2010) (citation omitted).

In addition, the "common meaning and usage" of the language at issue also supports non-actionability here: "[l]oose, figurative [and] hyperbolic" language supports the conclusion that the statement is opinion and constitutionally protected. *Milkovich v. Lorain Jour.*, 497 U.S. 1, 21 (1990). "Even a provably false statement is not actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts. . . ." *Peterson*, 2008 WL 4363653, at *3 (citing *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002)).

### b.     The Challenged Statements Are Protected Opinion and Hyperbole

*First*, Plaintiff alleges as defamatory a segment where "Kubler claims Plaintiff had 'gotten away with this for so long'" and that "it was surreal to see Plaintiff in person '[k]nowing everything [Kubler] knew about [Plaintiff], the children he abused, the parents he conned, all the crimes he's gotten away with'". (FAC ¶ 77a.) This is textbook non-actionable opinion and hyperbole.

---

[7] Under the First Amendment, federal courts have also taken a contextual approach, considering "(1) the phrasing of the allegedly defamatory statement; (2) the context in which the statement appears; (3) the medium through which it is disseminated; and (4) the circumstances surrounding its publication." *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Inv. Servs.*, 175 F. 3d 848, 853 (10th Cir. 1999).

In this segment, Ms. Kubler is commenting, in the general context and setting of a story told candidly from her point of view and based on facts previously disclosed and discussed, that Plaintiff has escaped accountability for the harm the WWASP programs have caused. Ms. Kubler's comments identify no specific "crime"; the term is clearly being used in a loose and figurative sense. Hyperbolic statements expressing a speaker's subjective beliefs are not actionable even if they appear to accuse the plaintiff of crimes. *See Milkovich*, 497 U.S. at 16–17 (citing *Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284–86 (1974) ("traitor" used "in a loose, figurative sense" and was "merely rhetorical hyperbole"); *Westmont Residential LLC v. Buttars*, 2014 UT App 291, ¶ 24 (while "'crooks' can carry a criminal connotation, in the context of Defendants' online review" it "is clearly not being used in this manner" and "was no more than rhetorical hyperbole") (citation omitted); *Nunes*, 299 F. Supp. 3d at 1231–32 (comments that plaintiff needed to consult a lawyer about accusations of harassment "did not make factual assertions of specific criminal conduct" and was "no more than rhetorical hyperbole").[8]

As the Series points out, these programs are *not* illegal, and have been allowed by an ineffectual legal and regulatory system to continue operating, with those who profit never being held accountable. It is Ms. Kubler's constitutionally unassailable opinion that youth programs like Ivy Ridge, that are part of the WWASP network, abused children and duped parents, and *should be* outlawed—based on what *she experienced*, as described and depicted in the Series. As here, "when an author outlines the facts available to [her], thus making it clear that the challenged statements

---

[8] Likewise non-actionable are "namecalling" statements like "great name for a villain"; "family of secrets"; "punchline"; "wildcard"; and Plaintiff's son Nathaniel's descriptions of him ("a man with two faces"; "dark side") (FAC ¶¶ 16, 28, 29, 43). *See Westmont Residential*, 2014 UT App 291, at ¶ 24 ("rhetorical hyperbole, including 'juvenile name-calling,' . . . is not defamatory because it cannot 'reasonably [be] interpreted as stating actual facts'"; affirming dismissal) (citation omitted); *Partington*, 56 F.3d at 1160 (describing plaintiff attorney as "[a] steer[] being led to the slaughterhouse" is "precisely the type of rhetorical flourish that the First Amendment protects"); *Chau v. Lewis*, 935 F. Supp. 2d 644, 660–61 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014) ("[E]pithets such as 'sucker,' 'fool,' and 'frontman' . . . represent precisely the type of hyperbolic language that lacks precise meaning and is incapable of being proven true or false").

represent [her] own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment" as non-actionable opinion. *Partington*, 56 F.3d at 1156-57; *Jefferson Cty. Sch. Dist.*, 175 F.3d at 853–54; *see also Keisel*, 2023 UT App 163 ¶ 64 (if facts underlying an expressed opinion "are publicly known or disclosed, the opinion, justified or unjustified, is privileged as a matter of law," because listeners "will understand they are getting the author's interpretation" and are "unlikely to construe the statement as insinuating the existence of additional, undisclosed defamatory facts") (citation omitted).

As the Series also relates, Plaintiff ran two of these programs (as a WWASP "franchisee") and did marketing for WWASP (Ex. 1C, Episode 3 at 29:34–30:36); it is Ms. Kubler's protected opinion that WWASP abused children and conned parents and, based on these disclosed facts about Plaintiff's involvement with WWASP, that he likewise "abused" children and "conned" their parents. *See, e.g., Partington*, 56 F.3d at 1156–57. Ms. Kubler's "opinions about the legal significance of [Plaintiff's] actions, even opinions that are questionable, are not actionable as defamation." *Nunes*, 299 F. Supp. 3d at 1232; *Chau*, 935 F. Supp. 2d at 660–61 (statements that plaintiff investment manager "played the role" of a "crook[ ] or moron[ ]", and that he "[didn't] give a [f——] about the investors" was "pure opinion that does not imply that it is premised on any undisclosed set of facts" and "merely represents [author's] own thesis of the origins of the financial crisis").

Further, Ms. Kubler's comments are made in the *specific context* of a segment where she describes her feelings and emotional reaction to seeing Plaintiff in the flesh at a Karaoke event, after having researched and read about him for so long.[9] In context, viewers would understand the

---

[9] Plaintiff's bare bones allegation that the Series invaded his "privacy by secretly filming him at a private karaoke event" to "further harass and defame him by portraying him in a false light" (FAC ¶ 34) cannot be the basis for a claim. Not only is this statement conclusory, but Plaintiff does not deny that it is true footage of him. A defamation claim cannot be premised on the use of true footage. *See, e.g., Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 557, 564 (S.D. Tex. 2022) ("Because CNN reported what Dr.

comments to be a visceral expression of her subjective viewpoint. *See, e.g., Hogan*, 2012 WL 4356326, at *9 (in context of bitter dispute, statement that plaintiff was "accused of extortion in court documents that were unsealed" did not reasonably convey that he was "criminally charged"); *Davidson v. Baird*, 2019 UT App 8, ¶ 32 (statement that plaintiff "destroyed" town "is obviously intended to express [defendant's] 'subjective belief and amounts to rhetorical hyperbole'" (citation omitted)). Particularly where—as here—the storyteller was personally involved in the controversial story, viewers fully expect that he or she is biased, and "language which generally might be considered as statements of fact may well assume the character of opinion." *Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1401–03 (1999).

In *Rinsley v. Brandt,* 700 F.2d 1304, 1306 (10th Cir. 1983), defendant's book "bitterly criticize[d]" plaintiff psychiatrist's "abuse of power in institutionalizing and treating mental health patients," including as an example an adolescent patient that plaintiff kept in seclusion, physically restrained, and "God knows what other cruelties he calls treatment." The patient ultimately died. "Stating that he is overwhelmed by 'anger and rage at the unbelievable arrogance of this man's methods,' [author] asks, 'What does it take to put a stop to such a man? How many more children must die?'" *Id.* at 1306–07. The Tenth Circuit found this and similar passages were "severe criticisms of Rinsley and his methods. But they are exactly that—exaggerated expressions of criticism. They are the type of statement that our society, interested in free and heated debate about matters of social concern, has chosen to protect." *Id.* at 1308. Again, the same is true here.

*Second*, Plaintiff complains that the Series "[p]resent[s] Plaintiff as a murderer by saying people in the 'higher ups' '[***seem to***] get away with murder' while showing Plaintiff's picture next to a news article about a murder at a youth program". (FAC ¶ 77b; *see also id.* ¶¶ 11, 24; Ex. 1C,

---

Immanuel had said, primarily using her own words and videos, the reports that she had said what she said are not materially false and cannot be the basis of a claim for defamation.").

Episode 3 at 00:00:19 – 00:00:33 for actual language.) The news clipping to which Plaintiff refers is fleetingly shown as part of a larger bulletin board that is filled with news clippings, photos, and other material; the headline of the clipping that happened to be next to Plaintiff's photo (he is not identified) refers to a teen having died in a "Program" involving "Therapy Hikes". (*Id*.) The clipping does not refer to "murder" and the Series makes no other reference to Plaintiff being involved in any "murder," or any program involving "Therapy Hikes." *Id.*

Moreover, the hyperbolic, idiomatic expression "seem to get away with murder" belies any factual accusation of an actual murder. As the Tenth Circuit explained, "[w]e all know of colloquial or hyperbolic uses" of phrases like "extortion"—or here, "get away with murder"—and it does not "always refer[] to a crime or similarly heinous conduct. Like with other words, context matters." *Hogan*, 762 F. 3d at 1107–08 (affirming dismissal).[10]

That is precisely what the court held in *CACI Premier Technology, Inc. v. Rhodes*, 536 F.3d 280 (4th Cir. 2008). There, a government contractor that provided interrogation services in Iraq sued a talk radio show's host based on "several statements," including that plaintiff's employees "could kill without being held to account": "So for those people that just want to kill for the sake of killing . . . call CACI and Titan, especially if you want to torture people, and never have to come under the long arm of the law. I mean, *that's how you get away with murder*." *Id.* at 300–01 (emphasis added). The court held that the host "was using hyperbole and exaggeration to make the point, which was well supported by her sources . . ., that current laws are ineffective in

---

[10] And here, the prefatory words "seem to"—which Plaintiff omits in his FAC—further signal that what follows is opinion. *See Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133, 147 (D.D.C. 2017) ("[T]he word 'basically' preceding the phrase 'undermine democratic movements' is a red flag that [speaker] is using 'loose' or 'hyperbolic' language.").

regulating military contractors operating abroad," and this could not "support[] a claim for defamation by CACI." *Id.* at 302 (affirming dismissal on summary judgment).

*Third*, Plaintiff also complains about statements of Ms. Kubler's opinion or hyperbolic expressions elsewhere in the Series. For instance, Plaintiff argues that the Series "makes several claims of specific criminal activities that the youth programs Narvin was associated with committed or facilitated, with Defendants claiming 'kidnapping' was one such activity." (FAC ¶ 19.) The Series does not use the term "kidnapping" in connection with Plaintiff or the programs he ran; it is not of and concerning him. *See* Section I.A, *supra*. Even if it was, it is not actionable because it is either (a) like "extortion" and "blackmail," an expression of opinion based on disclosed facts, namely Ms. Kubler's own personal experiences disclosed in the Series (Ex. 1A, Episode 1 at 7:05–7:35) or (b) if it is a statement of fact it is not "false," *see Anderson v. Cramlet*, 789 F.2d 840, 844–45 (10th Cir. 1986) (that plaintiff was wrongly labeled a "kidnapper" instead of having violated a custody order was not material falsehood); *Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) ("blackmail" used in "a loose, figurative sense"). Indeed, as Plaintiff acknowledges, some people involved in the transportation to teens to WWASP programs describe this process as "kidnapping." (FAC ¶ 19 n.6.)

Again, through the Series, Kubler and other teens are now speaking out as adults on their treatment in these programs. They are entitled to their "severe" opinions and criticisms, which are an important part of the "free and heated debate about matters of social concern" that this country "has chosen to protect." *Rinsley,* 700 F.2d at 1308.

### 3.    The Series' Accurate Report of the Investigation of Plaintiff's Costa Rica Facility and His Arrest Is Non-Actionable and Privileged.

As one of his purported claims, Plaintiff argues that the Series "[p]resent[s] an arrest of Plaintiff as if Plaintiff was convicted of a crime of child abuse where no such conviction occurred

and where Defendants intentionally and strategically omitted any mention of the fact Plaintiff was acquitted of any charges arising from this arrest." (FAC ¶ 77d; *see also id.* ¶¶ 61–63.)

*First*, the claimed defamation simply does not exist. The Series does not assert that Plaintiff was "convicted," much less specify that he was convicted for a crime of child abuse. The Series only states that "Dundee was only open for 19 months before authorities were alerted to abuse, raided the facility and Narvin was arrested." (Ex. 1C, Episode 3 at 30:36–30:42.)

*Second*, no claim will lie for the truthful report that Plaintiff was arrested. Plaintiff *admits* he was arrested, but asserts that the charges were eventually dropped (FAC ¶ 63). The statement is not just substantially but *literally* true, and it is not rendered "false" because it doesn't include additional information favorable to Plaintiff.

> [T]he omission of additional favorable information from an otherwise true publication does not render a statement materially false. '[T]he First Amendment prohibits a rule that holds a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts which might have cast plaintiff in a more favorable or balanced light.'

*Brokers' Choice*, 861 F.3d at 1108 (citations omitted); *Global Relief Found. v. N.Y. Times Co.*, 390 F.3d 973 (7th Cir. 2004) (reports, gist of which were that plaintiff was being investigated by federal government, held substantially true). [11]

*Third*, the truthful report of Plaintiff's arrest also is subject to the privilege for fair reports of official proceedings.  As to this privilege, under the doctrine of "dépeçage," California's Civil Code Section 47(d) applies because the Defendants and their work on the Series were based in California (FAC ¶¶ 2–3), where the Series was created, edited, produced and published. (Kubler

---

[11] *See also Martin v. Hearst Corp.*, 777 F.3d 546 (2d Cir. 2015) (reporting that plaintiff arrested on drug charges was true, even when prosecution declined to press charges and arrest was therefore in effect expunged); *Casper v. Washington Post Co.*, 549 F. Supp. 376, 378 (E.D. Pa. 1982) (omitting that officers were acquitted of criminal charges did not make story about their police brutality actionable defamation).

Decl. ¶¶ 40–43.)[12] California's privilege is absolute and protects publications or broadcasts containing "a fair and true report" of, *inter alia*, "(A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof," and is broadly construed in the interest of protecting a free press. Cal. Civ. Code § 47(d).

As "absolute privilege," Section 47(d) is limited only by the media's responsibility to "ensur[e] that the 'gist or sting'" of the report is "accurately conveyed" and "this responsibility carries with it a certain amount of literary license." *Sipple v. Found. for Nat'l Progress*, 71 Cal. App. 4th 226, 242 (1999). Because the privilege is absolute, it "does not require the reporter to resolve the merits of the charges, *nor does it require that he present the [plaintiff's] version of the facts*." *Dorsey v. Nat'l Enquirer,* 973 F.2d 1431, 1436 (9th Cir. 1992) (emphasis added). Thus, *Paterno v. Superior Court* rejected plaintiff's argument that it could avoid the privilege because defendant did not "place [the] legal proceeding in 'context' by including what [plaintiff] considers are the 'key facts.'" 163 Cal. App. 4th 1342, 1355 (2008); *Smith v. Press Democrat*, 2011 WL 5006463, at *5 (N.D. Cal. 2011) ("[T]he fair and true report privilege does not require the Press Democrat to have presented plaintiff's side of her story"). Nor can Plaintiff evade the privilege by claiming Defendants are "biased" against him. *McClatchy Newsp. v. Superior Court*, 189 Cal.

---

[12] There is a "true conflict" of laws regarding the Utah and California fair report privileges: while Utah's privilege requires that the publication be made "without malice," Utah Code Ann. § 45-2-3(4), California's fair report privilege, Cal. Civ. Code § 47(d), is "absolute" and is *not* defeasible by malice. *See, e.g., Gallagher v. Philipps*, 563 F. Supp. 3d 1048, 1082 (S.D. Cal. 2021). Under the doctrine of "dépeçage," whether a statement is defamatory is "distinct from the issue of whether that statement is privileged," *Diamond Ranch Academy, Inc. v. Filer*, 117 F. Supp. 3d 1313, 1322 (D. Utah 2015) (citation omitted), and privileges "meant to protect speakers"—including specifically fair report—are governed by the law of speaker's domicile. *Wilkow v. Forbes, Inc.,* 2000 WL 631344, at *7 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir. 2001). California's interest "in fixing the scope of a privilege applicable to conduct taking place within its borders is paramount," and the policy reflected in its fair report privilege "would be wholly eviscerated" if it was "evaluated under another state's privilege laws." *Id.; accord Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176–78 (2d Cir. 2021); *Goguen v. NYP Holdings, Inc.*, 544 P. 3d 868, 881 (Mont. 2024) (all holding that issue of fair report privilege was governed by law of speaker's domicile).

App. 3d 961, 971 (1987) ("allegations of conspiracy" between newspaper and source of official information "do not pierce the protective shield embodied in the statute").

### D.   Plaintiff's Claims Also Should Be Dismissed Because He Does Not—and Could Not—Plead Actual Malice.

In addition to all of the foregoing grounds for dismissal, under the First Amendment a limited purpose public figure like Plaintiff may recover only on clear and convincing proof of "actual malice"—that Defendants purposely published known falsehoods, or in fact subjectively entertained serious doubts as to the truth of the statements at issue prior to publication. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). This standard, designed to provide the "breathing space" needed to ensure robust reporting on public figures and events, *id.* at 271–72, is "famously 'daunting,'" *Couch v. Verizon Commc'ns Inc.*, 105 F.4th 425, 432 (D.C. Cir. 2024) (citations omitted), and at the "motion-to-dismiss stage," courts may "peer down the road towards a plaintiff's eventual evidentiary burden to deduce whether he plausibly alleged the types of facts that can, if proven, satisfy" that burden. *Id.*

*Plaintiff is a Limited Purpose Public Figure.* "The level of protection that a statement receives, under principles of free speech and expression, depends upon the identity of the plaintiff alleging defamation." *Davidson*, 2019 UT App 8, ¶ 37. And "'those who by choice or mishap acquire the status of a public official or public figure surrender a sizeable measure of their right to recover damages from those who defame them,' in the form of facing a heavier burden to demonstrate that defamation occurred." *Id.* (quoting *O'Connor v. Burningham*, 2007 UT 58, ¶ 8).

Plaintiff's legal conclusion that he "is neither a public figure nor a quasi-public figure requiring 'actual malice'" (FAC ¶ 102) is incorrect. "There are two ways an individual can be considered a public figure": (1) where the individual is "a public figure for all purposes" by virtue of their "general fame or notoriety"; and (2) if an individual "intentionally sought or obtained a position of influence" as to "a particular public controversy", in which case they are a "limited purpose public figure" ("LPPF"). *Davidson,* at ¶¶ 37–39 (citations omitted).

To determine whether an individual is a LPPF, Utah courts first "isolate the specific public controversy related to the defamatory remarks." *Pure, Inc.*, 450 F.3d at 1137. As the courts have squarely found, "it is clear that there exists a public controversy as to the most effective method of treating at-risk teenagers." *Id.*; *accord Diamond Ranch Academy, Inc. v. Filer*, 2016 WL 633351, at *6, *17 (D. Utah Feb. 17, 2016) ("a public debate . . . is clearly occurring" regarding "private for-profit teen rehabilitation programs").

The Court then determines whether plaintiff inserted himself into that controversy "in order to influence the resolution of the issues involved." 450 F.3d at 1137. Here, by both Plaintiff's own words and actions, Plaintiff inserted himself into this public controversy. *See* Factual Background, Section D. As in *Pure, Inc.*, "the record includes numerous news accounts about the public debate" and that Plaintiff has taken "an active role in this debate by both promoting" his programs and defending those "that are marred by scandal." 450 F.3d at 1137. Unsurprisingly, his arrest and closure of his Costa Rica facility in particular was covered extensively in the press and was the basis for investigation of his South Carolina facility. (Ex. 8, Hayes; Ex. 10, Smith.) Since the beginning of his career, Plaintiff has been publicly associated with WWASP and the troubled teen industry in news reports (Exs. 2-12), a leading book on the subject (Ex. 13), and in other media (Ex. 14), and he continues to speak freely about his involvement to this day. (Ex. 15A-15B.)

**Plaintiff Does Not and Cannot Plead Actual Malice.**  Dismissal is in order because Plaintiff expressly abjures responsibility to properly plead actual malice (FAC ¶ 102), and he *cannot* do so for the simple reason there is no false statement of fact: the statements challenged by Plaintiff are all either substantially true or protected opinion that could not be "false" facts. *Brokers' Choice*, 861 F.3d at 1106 ("by requiring proof that the defendant published with knowledge or reckless disregard that the statement was false," actual malice "also requires proof that the statement was false").

Even if Plaintiff could identify a purported false statement of fact as to him, the actual malice standard requires him to show that Defendants published it with "a high degree of awareness of probable falsity." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Here, Plaintiff has not alleged (and could not plausibly allege) that Defendants subjectively had serious doubts as to the truth of the publication. "Courts of appeals have recently dismissed defamation cases for failure to sufficiently plead actual malice under the more robust Rule 12(b)(6) standard articulated by the Supreme Court in *Iqbal*" and "where the allegations were conclusory and lacked plausibility." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279–80 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015) (citing cases).

Plaintiff's allegation that "Defendants published these statements with the requisite degree of fault" (FAC ¶ 79) is entirely conclusory and inadequate, asserting "buzz words" without factual support that "Defendants acted negligently and with reckless disregard for the truth"; had "no basis for believing the statements true and failed to conduct a reasonable investigation"; "knew or had reason to know that these statements were false". *Id.*[13] "This kind of conclusory allegation—a mere recitation of the legal standard—is precisely the sort of allegations that *Twombly* and *Iqbal* rejected." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377–78 (4th Cir. 2012) (affirming dismissal); *Couch*, 105 F.4th at 432–33 (plaintiff alleged no "smoking-gun evidence" of knowing falsity or "specific allegations of why [defendant] might have had "obvious reasons to doubt the accuracy of" sources' accounts; affirming dismissal) (citations omitted).

## II.   PLAINTIFF'S REMAINING TORT CLAIMS ARE DUPLICATIVE OF HIS DEFAMATION CLAIM AND FAIL AS A MATTER OF LAW.

Plaintiff's remaining tort claims for false light invasion of privacy, intentional infliction of emotional distress, and civil conspiracy are duplicative of his defamation claim, and fail for the same

---

[13]  Of course, negligence and failure to investigate are precisely what actual malice is *not*. *See, e.g., St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

reasons. "A plaintiff may not attempt an end-run around First Amendment strictures protecting speech by instead suing for defamation-type damages under non-reputational tort claims. . . . Rather, non-defamation torts based on speech must meet First Amendment requirements." *Keisel*, 2023 UT App 163, at ¶ 70 (tort claims for false light and emotional distress also failed because they were "based on the same statements at issue in the defamation claims") (citations omitted).

"Virtually any defamation claim may be recast as an action for false light invasion of privacy, and for that reason[,] false light claims that arise from defamatory speech raise the same First Amendment concerns as are implicated by defamation claims." *Id.* (citation omitted) Likewise, "where an emotional distress claim is based on the same facts as a claim for defamation, appropriate concern for the First Amendment rights of the parties must be considered." *Id.* (citation omitted); *Hustler Magazine v. Falwell*, 485 U.S. 46, 52–56 (1988). Similarly, here, all of Plaintiffs' remaining tort claims are premised on the same exact facts upon which they base their defamation claim.[14] All these claims, "based on the same statements at issue in the defamation claims," fail as a matter of law.

The emotional distress claim additionally fails because it requires Plaintiff to show Defendants' actions in creating and publishing the Series was for "the purpose of inflicting emotional distress" on Plaintiff and was "of such a nature as to be considered outrageous and intolerable" in civilized society. *Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 58, 70 P.3d 17, 30. Plaintiff's allegations as to Defendants' constitutionally protected speech do not begin to rise to the level of egregiousness required to support such a claim.[15]

---

[14] Plaintiff's false light claim also fabricates claims that the Series accuses him of "covering up rape and assault to protect abusers" and "participating in child trafficking". (FAC ¶ 105.) These statements, like many others he alleges, appear nowhere in the Series and cannot be the basis for a false light claim.

[15] *See, e.g., Porter v. Staples the Office Superstore*, 521 F. Supp. 3d 1154, 1161-62 (D. Utah 2021) (Parrish, J.) (dismissing emotional distress claim based on alleged "false and damning statements" as insufficiently "outrageous" as matter of law); *Davidson*, 2019 UT App 8, ¶ 59 ("While it is evident that the comments were critical, and perhaps even hurtful for them to endure, such speech, without more, is insufficient to constitute intentional infliction of emotional distress").

Finally, there can be no "civil conspiracy" without an underlying tort, *LifeVantage Corporation v. Domingo*, 2016 WL 4705540, at *8 (D. Utah Sept. 8, 2016) (Parrish, J.), and moreover, Plaintiff "fails to offer any factual allegations to support the claim," only "'unadorned, the-defendant-unlawfully-harmed-me-accusation[s].'" *D'Addabbo v. Smith*, 2018 WL 5779077, at *6 (D. Utah Sept. 13, 2018) (quoting *Iqbal*, 556 U.S. at 678) (dismissing conspiracy claim).

## III. SINCE DISMISSAL IS IN ORDER AND THE CLAIMS ARE DIRECTED TO SPEECH ON A MATTER OF PUBLIC CONCERN, DEFENDANTS ALSO ARE ENTITLED TO RELIEF UNDER THE ANTI-SLAPP ACTS.

"Anti-SLAPP statutes, which have been enacted in many states (including California and Utah)," are "'designed to protect the defendant from having to litigate meritless claims aimed at chilling First Amendment expression.'" *Diamond Ranch Academy, Inc. v. Filer*, 2016 WL 633351, at *4 (D. Utah Feb. 17, 2016) (citation omitted). By invoking these statutes, a defendant can obtain early dismissal of meritless First Amendment-chilling litigation, and upon application, its reasonable attorneys' fees. *See* Cal. C.C.P. § 425.16(c)(1); Utah Code Ann. § 78B-25-110.[16]

The Court's first determination under the anti-SLAPP statutes is whether the plaintiff's claims arise out of "conduct in furtherance of the exercise of the . . . constitutional right of free speech in connection with a public issue or an issue of public interest." Cal. C.C.P. § 425.16(b)(1), (e)(4); Utah Code Ann. § 78B-25-102 (statute applies to civil actions based on "exercise of the right of freedom of speech or of the press . . . on a matter of public concern"). The public interest

---

[16] Utah's new anti-SLAPP Act, the Uniform Public Expression Protection Act ("UPEPA") was adopted last year. As amended, Defendants do not believe it is any less speech-protective than California's anti-SLAPP Act—to the contrary, UPEPA's drafters relied on California's act and cases interpreting it throughout the comments on the statute. *See* Uniform Public Expression Protection Act, Nat'l Conf. of Comm'rs on Uniform State Laws (July 2020), *passim* ("UPEPA Report"). Defendants discuss both statutes herein. To the extent there was a "true conflict," California's act should apply under the *dépeçage* rule because where, as here, Defendants and their production work were based in California (FAC ¶¶ 2–3; Kubler Decl. ¶¶ 40–43), "California's strong interest in protecting its citizens' free speech activities," strongly favor applying CA's anti-SLAPP law. *Diamond Ranch Academy, Inc. v. Filer*, 117 F. Supp. 3d 1313, 1322–24 (D. Utah 2015).

requirement must be "construed broadly so as to encourage participation by all segments of our society in vigorous public debate related to issues of public interest." *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 23 (2007) (citation omitted). There is no question the claims against the Series challenge speech on a matter of public interest.[17]

As such, the burden then shifts to Plaintiff to "establish, without the benefit of discovery, a probability that it will prevail on its claims." *Diamond Ranch,* 2016 WL 633351, at *4 (citing Cal. C.C.P. § 425.16(b)(2)); Utah Code Ann. § 78B-25-107(1)(c)(i). To establish a "reasonable probability" the plaintiff needs to "state[ ] and substantiate[ ] a legally sufficient claim." *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal.4th 728, 741 (2003). Plaintiff "cannot rely on allegations in the complaint, but must bring forth evidence that would be admissible at trial." *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1576 (2005); UPEPA Report, § 7 cmt. 4 ("prima-facie viability" under Utah Code Ann. § 78B-25-107(1)(c)(i) requires plaintiff to "produce evidence" to support causes of action).

When "an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018). "[I]f Plaintiffs cannot plead a plausible cause of action under the FRCP 12(b)(6) standard, then Plaintiffs as a matter of law cannot meet the probability of success on the merits standard." *Resolute Forest Prods. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1026 (N.D. Cal. 2017). *See also* Utah Code Ann. § 78B-25-107(1) (case must be

---

[17] *See Diamond Ranch,* 2016 WL 633351, at *6 (use of "private for-profit teen rehabilitation programs" is "an issue of public interest") (citing, *e.g.,* U.S. GAO, Residential Treatment Programs: Concerns Regarding Abuse and Death in Certain Programs for Troubled Youth (Oct. 10, 2007); *Pure, Inc.*, 450 F.3d at 1137 ("[I]t is clear that there exists a public controversy as to the most effective method of treating at-risk teenagers")).

dismissed if either plaintiff fails to establish a prima facie case or defendant establishes that plaintiff "failed to state a cause of action").

For the reasons set forth above, Plaintiff has not stated a plausible claim for relief under Rule 12(b)(6), and thus axiomatically flunks his anti-SLAPP law burden as a matter of law. *Id.* Defendants are therefore also entitled to relief under the Anti-SLAPP Acts. *See Resolute Forest*, 302 F. Supp. 3d at 1024 (even though motion to dismiss granted "this Court nonetheless addresses the motions to strike '[b]ecause the issue of attorneys' fees and costs is not rendered moot by a dismissal'") (quoting *Robinson v. Alameda Cnty.*, 875 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012)).

While the Court need not go further to dismiss the Complaint under 12(b)(6) and grant the motion to strike (and should do both), the Court can also find that Plaintiff could never make the necessary showing to meet his anti-SLAPP burden of substantiating with admissible evidence a prima facie case that he will probably succeed on his claims. Among other things, Plaintiff could never plausibly plead (much less substantiate with admissible evidence) that Defendants "subjectively" made any statement with a "high degree of awareness of its probable falsity". As reflected in the Kubler Declaration, given the public record regarding Plaintiff and his own admitted association with WWASP and the "troubled teen" industry, and the scope of research conducted by Ms. Kubler, including her own personal experience and first-person accounts of other students, former staff and public officials, and other footage and materials shown in the Series, no claim of actual malice could conceivably be substantiated. (*See* Kubler Decl. ¶¶ 15–24, 27–39.) As such, consistent with the strong public policy of both Utah's and California's anti-SLAPP acts, striking the Complaint and awarding fees in an action like this one, which seeks to punish constitutionally protected speech, is especially appropriate.

## **CONCLUSION**

Defendants respectfully request that Plaintiff's First Amended Complaint be dismissed with prejudice, and that this Court strike Plaintiff's Complaint pursuant to Cal. C.C.P. § 425.16, or alternatively, Utah Code Ann. § 78B-25-101, *et seq.*, and award Defendants their attorneys' fees in an amount to be determined.

Dated: August 30, 2024

David W. Tufts (8736)
Ian M. Kinghorn (17717)
DENTONS DURHAM JONES PINEGAR P.C.
111 South Main, Suite 2400
Salt Lake City, Utah 84111
(801) 415-3000
*david.tufts@dentons.com*
*ian.kinghorn@dentons.com*

Respectfully submitted,

*/s/ Natalie J. Spears*

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
*natalie.spears@dentons.com*
*gregory.naron@dentons.com*
*jacqui.giannini@dentons.com*

*Attorneys for Defendants Katherine Kubler and Netflix, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 30, 2024, a true and correct copy of the foregoing

was served by CM/ECF on all counsel or parties of record on the service list.


/s/ Natalie J. Spears